# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| LIBERTY UNIVERSITY, Inc., a Virginia Nonprofit corporation, MICHELE G. WADDELL, DAVID STEIN, M.D., JOANNE W. MERRILL, DELEGATE KATHY BYRON, and JEFF HELGESON, <br><br> Plaintiffs <br><br> v. <br><br> TIMOTHY GEITHNER, Secretary of the Treasury of the United States, in his official capacity, KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services, in her official capacity, HILDA L. SOLIS, Secretary of the United States Department of Labor, in her official capacity, and ERIC HOLDER, Attorney General of the United States, in his official capacity, <br><br> Defendants. | Case No. 6:10-cv-00015-nkm <br><br> **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** <br><br> Judge Norman K. Moon |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ......................................................................................................6

    A.    Statutory Background ..................................................................6

    B.    Current Proceedings ..................................................................10

ARGUMENT ..........................................................................................................11

    I.    STANDARD OF REVIEW ........................................................11

    II.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS'
        CHALLENGES TO THE MINIMUM COVERAGE AND
        EMPLOYER RESPONSIBILITY PROVISIONS ..............................12

        A.    Plaintiffs lack standing because the minimum coverage
            provision and the employer responsibility provision do not
            take effect until 2014 ................................................................12

        B.    Plaintiffs' claims are unripe ......................................................19

        C.    The Anti-Injunction Act bars plaintiffs' claims ........................21

    III.    THE MINIMUM COVERAGE PROVISION AND THE EMPLOYER
        RESPONSIBILITY PROVISION FALL WITHIN CONGRESS'S
        CONSTITUTIONAL AUTHORITY UNDER THE COMMERCE
        CLAUSE AND, INDEPENDENTLY, THE GENERAL WELFARE
        CLAUSE ....................................................................................22

        A.    The comprehensive regulatory measures of the ACA, including
            the minimum coverage provision, are a proper exercise of Congress's
            Article I powers under the Commerce Clause and the Necessary
            and Proper Clause ......................................................................23

            1.    Congress's Commerce Clause authority is broad and the
                Court's review is deferential ............................................23

            2.    The ACA, and the minimum coverage provision, regulate
                the interstate market in health insurance and health care
                services ..............................................................................25

            3.    The minimum coverage provision is an integral part of the
                larger regulatory scheme and is necessary and proper to
                Congress's regulation of interstate commerce ..............26

4.      The minimum coverage provision regulates conduct with substantial effects on interstate commerce ....................................30

B.      The minimum coverage provision is a valid exercise of Congress's independent power under the General Welfare Clause............................34

C.      The employer responsibility provision is also a valid exercise of Congress's Commerce Clause and General Welfare Clause authorities.....................................................................................37

D.      The minimum coverage provision and the employer responsibility provision do not offend the Tenth Amendment.........................................39

E.      The ACA does not violate the Republican Form of Government Clause....................................................................................39

IV.    PLAINTIFFS' FIRST AMENDMENT CLAIMS ARE MERITLESS ................41

A.      The minimum coverage provision and the employer responsibility provision do not violate the Free Exercise Clause or the Religious Freedom Restoration Act ........................................................................42

B.      The minimum coverage provision and the employer responsibility provision do not violate plaintiffs' free association or free speech rights ..............................................................................................44

C.      The religious exemptions to the minimum coverage provision are consistent with the Establishment Clause...................................................48

V.     THE RELIGIOUS EXEMPTIONS TO THE MINIMUM COVERAGE PROVISION ARE CONSISTENT WITH EQUAL PROTECTION...................52

VI.    THE MINIMUM COVERAGE PROVISION IS NOT A DIRECT TAX OR A CAPITATION TAX  ...........................................................................................55

VII.   PLAINTIFFS LACK STANDING TO ASSERT THEIR OTHER CHALLENGES .....................................................................................................59

CONCLUSION...............................................................................................................60

# TABLE OF AUTHORITIES

**Cases:**

*ASARCO Inc. v. Kadish,*
  490 U.S. 605 (1989).................................................................. 59

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967)............................................................. 19, 20

*Alaska Airlines, Inc. v. Brock,*
  480 U.S. 678 (1987).................................................................. 15

*Alexander v. "Americans United" Inc.,*
  416 U.S. 752 (1974).................................................................. 22

*Arizonans for Official English v. Arizona,*
  520 U.S. 43 (1997)................................................................... 18

*Arlington Heights v. Metropolitan Housing Development Corp.,*
  429 U.S. 252 ........................................................................... 52

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009)......................................................... 12, 19

*Barr v. United States,*
  736 F.2d 1134 (7th Cir. 1984) ................................................... 21

*Bartley v. United States,*
  123 F.3d 466 (7th Cir. 1997) .................................................... 22

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)............................................................. 12, 19

*Bethel Baptist Church v. United States,*
  822 F.2d 1334 (3d Cir. 1987).................................................... 54

*Bill Johnson's Rests. v. NLRB,*
  461 U.S. 731 (1983)................................................................. 44

*Blanchette v. Conn. Gen. Ins. Corp.,*
  419 U.S. 102 (1974)................................................................. 20

*Blodgett v. Holden,*
  275 U.S. 142 (1927)................................................................... 5

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth*,
    529 U.S. 217 (2000)................................................................... 47

*Bob Jones Univ. v. Simon*,
    416 U.S. 725 (1974)................................................... 21, 22, 36

*Bolling v. Sharpe*,
    347 U.S. 497 (1954)................................................................... 52

*Braunfeld v. Brown*,
    366 U.S. 599 (1961)................................................................... 43

*Brushaber v. Union Pac. R. Co.*,
    240 U.S. 1 (1916)....................................................................... 58

*Buckley v. Valeo*,
    424 U.S. 1 (1976)....................................................................... 37

*Charles C. Steward Mach. Co. v. Davis*,
    301 U.S. 548 (1937)................................................................... 34

*Children's Healthcare Is a Legal Duty, Inc. v. De Parle*,
    212 F.3d 1084 (8th Cir. 2000) ................................................... 49

*Citizens United v. FEC*,
    130 S. Ct. 876 (2010)................................................................. 14

*Comite de Apoyo a los Trabajadores Agricolas v. Dep't of Labor*,
    995 F.2d 510 (4th Cir. 1993) ..................................................... 17

*Virginia v. Sebelius*,
    No. 3:10-cv-00188, 2010 WL 2991385 (E.D. Va. Aug. 2, 2010) ........................................... 6

*Corp. of Presiding Bishop v. Amos*,
    483 U.S. 327 (1987)............................................................. 51, 53

*Covenant Media of S.C. v. City of N. Charleston*,
    493 F.3d 421 (4th Cir. 2007) ..................................................... 15

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005)................................................. 48, 49, 50, 51

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006)................................................................... 12

*Daniel v. Paul,*
395 U.S. 298 (1969)................................................................ 33

*Droz v. Comm'r,*
48 F.3d 1120 (9th Cir. 1995) .......................... 49, 50, 51, 53, 54

*EEOC v. Wyoming,*
460 U.S. 226 (1983)I ............................................................ 38

*Employment Division v. Smith,*
494 U.S. 872 (1990)......................................................... 4, 42

*F.S. Royster Guano Co. v. Virginia,*
253 U.S. 412 (1920)................................................................ 52

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
130 S. Ct. 3138 (2010)........................................................ 15

*GBA Assocs. v. Gen. Servs. Admin.,*
32 F.3d 898 (4th Cir. 1994) .................................................. 12

*Garcia v. San Antonio Metro. Transit Auth.,*
469 U.S. 528 (1985)................................................................ 38

*Gillette v. United States,*
401 U.S. 437 (1971)......................................................... 52, 53

*Goetz v. Glickman,*
149 F.3d 1131 (10th Cir. 1998) ............................................. 57

*Gonzales v. O Centro Esp. Benef. Uniao Do Vege,*
546 U.S. 418 (2006)................................................................ 43

*Gonzales v. Raich,*
545 U.S. 1 (2005)........................................................ passim

*Grand Lodge of Fraternal Order of Police v. Ashcroft,*
185 F. Supp. 2d 9 (D.D.C. 2001) .......................................... 20

*Gregory v. Ashcroft,*
501 U.S. 452 (1991)................................................................ 40

*Hatcher v. Comm'r,*
688 F.2d 82 (10th Cir. 1979) ................................................ 49

*Head Money Cases (Edye v. Robertson),*
   112 U.S. 580 (1884).................................................................... 56, 57

*Heart of Atlanta Motel, Inc. v. United States,*
   379 U.S. 241 (1964)....................................................................... 33

*Helvering v. Davis,*
   301 U.S. 619 (1937)....................................................................... 35

*Henson v. Comm'r,*
   66 T.C. 835 (1976)......................................................................... 49

*Hobbie v. Unemployment Appeals Comm'n,*
   480 U.S. 136 (1987)....................................................................... 48

*Hodel v. Va. Surface Mining & Reclamation Ass'n,*
   452 U.S. 264 (1981)....................................................................... 29

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.,*
   425 U.S. 738 (1976)....................................................................... 25

*Hunter v. Underwood,*
   471 U.S. 222 (1985)....................................................................... 52

*Hylton v. United States,*
   3 U.S. (3 Dall.) 171 (1796) ......................................................... 57, 58

*Jaggard v. Comm'r,*
   582 F.2d 1189 (8th Cir. 1978), *cert. denied*, 440 U.S. 913 (1979)......................................... 49

*Johanns v. Livestock Mktg. Ass'n,*
   544 U.S. 550 (2005)....................................................................... 47

*Karcher v. May,*
   484 U.S. 72 (1987)......................................................................... 18

*Keller v. State Bar of California,*
   496 U.S. 1 (1990)........................................................................... 47

*Kelley v. United States,*
   69 F.3d 1503 (10th Cir. 1995) ....................................................... 40

*Knowlton v. Moore,*
   178 U.S. 41 (1900).......................................................................... 58

*Largess v. Supreme Judicial Court for State of Massachusetts,*
    373 F.3d 219 (1st Cir. 2004) ............................................. 40

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971) .......................................................... 51

*Lewis v. Casey,*
    518 U.S. 343 (1996) .......................................................... 15

*License Tax Cases,*
    72 U.S. (5 Wall.) 462 (1866) ............................... 3, 34, 35

*Locke v. Davey,*
    124 S. Ct. 1307 (2004) ..................................................... 48

*Lovelace v. Lee,*
    472 F.3d 174 (4th Cir. 2006) ........................................... 43

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................. 12, 13, 16

*M'Culloch v. Maryland,*
    17 U.S. (4 Wheat.) 316 (1819) ........................................ 29

*Madison v. Riter,*
    355 F.3d 310 (4th Cir. 2003) ........................................... 50

*McConnell v. FEC,*
    540 U.S. 93 (2003) ............................................................ 14

*Miller v. Brown,*
    462 F.3d 312 (4th Cir. 2006) ..................................... 19, 20

*Moon v. Freeman,*
    379 F.2d 382 (9th Cir. 1967) ........................................... 57

*NLRB v. Jones & Laughlin Steel Corp.,*
    301 U.S. 1 (1937) ............................................................. 38

*Neitzke v. Williams,*
    490 U.S. 319 (1989) ............................................................ 6

*Nelson v. Sears, Roebuck & Co.,*
    312 U.S. 359 (1941) .......................................................... 36

*New York v. United States*,
    505 U.S. 144 (1992) ........................................................................................ 39

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
    129 S. Ct. 2504 (2009) ..................................................................................... 5

*Olsen v. CIR*,
    709 F.2d 278 (4th Cir. 1983) ...................................................................... 50, 53

*Pac. Ins. Co. v. Soule*,
    74 U.S. 443 (1868) .......................................................................................... 58

*Palmer v. Comm'r*,
    52 T.C. 310 (1969) .......................................................................................... 49

*Plyler v. Doe*,
    457 U.S. 202 (1982) ........................................................................................ 52

*Pollock v. Farmers' Land & Trust Co.*,
    158 U.S. 601 (1895) .................................................................................. 57, 58

*Raines v. Byrd*,
    521 U.S. 811 (1997) ........................................................................................ 17

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ........................................................................................ 45

*Rodgers v. United States*,
    138 F.2d 992 (6th Cir. 1943) .......................................................................... 56

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
    547 U.S. 47 (2006) .......................................................................................... 45

*Sabri v. United States*,
    541 U.S. 600 (2004) ........................................................................................ 29

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ........................................................................................ 43

*Smelt v. County of Orange*,
    447 F.3d 673 (9th Cir. 2006) .......................................................................... 17

*Sonzinsky v. United States*,
    300 U.S. 506 (1937) .................................................................................. 36, 39

*South Carolina ex rel. Tindal v. Block*,
    717 F.2d 874 (4th Cir. 1983) ............................................. 56

*South Dakota v. Dole*,
    483 U.S. 203 (1987)....................................................... 35

*Springer v. United States*,
    102 U.S. 586, 602 (1881)................................................. 57

*Steel Co. v. Citizens for a Better Env't*
    523 U.S. 83 (1998) ........................................................ 11

*Tarsney v. O'Keefe*,
    225 F.3d 929 (8th Cir. 2000) ............................................. 47

*Templeton v. Comm'r*,
    719 F.2d 1408 (7th Cir. 1983) ............................................ 54

*Texas v. United States*,
    523 U.S. 296 (1998)....................................................... 20

*The Piney Run Preservation Ass'n v. The County Comm'rs of Carroll County, MD*,
    523 F.3d 453 (4th Cir. 2009) ............................................. 11

*Thomas v. Union Carbide Agric. Prods. Co.*,
    473 U.S. 568 (1985)................................................... 19, 20

*Toilet Goods Ass'n v. Gardner*,
    387 U.S. 158 (1967)....................................................... 20

*Tyler v. United States*,
    281 U.S. 497 (1930)....................................................... 58

*Union Elec. Co. v. United States*,
    363 F.3d 1292 (Fed. Cir. 2004)........................................... 58

*United States v. Clintwood Elkhorn Mining Co.*,
    553 U.S. 1 (2008) ........................................................ 22

*United States v. Comstock*,
    130 S. Ct. 1949 (2010).................................................... 29

*United States v. Darby*,
    312 U.S. 100 (1941)....................................................... 38

*United States v. Johnson*,
    114 F.3d 476 (4th Cir. 1997) ................................................................ 39

*United States v. Kukafka*,
    478 F.3d 531 (3d Cir. 2007) ................................................................ 24

*United States v. Lee*,
    455 U.S. 252 (1982) ................................................................ 50

*United States v. Lopez*,
    514 U.S. 549 (1995) ................................................................ 25

*United States v. Malloy*,
    568 F.3d 166 (4th Cir. 2009) ................................................................ 24

*United States v. Mfrs. Nat'l Bank of Detroit*,
    363 U.S. 194 (1960) ................................................................ 3, 58

*United States v. Morrison*,
    529 U.S. 598 (2000) ................................................................ 22, 25

*United States v. Salerno*,
    481 U.S. 739 (1987) ................................................................ 23

*United States v. Sanchez*,
    340 U.S. 42 (1950) ................................................................ 34, 36

*United States v. South-Eastern Underwriters Ass'n*,
    322 U.S. 533 (1944) ................................................................ 25, 28

*United States v. Stangland*,
    242 F.2d 843 (7th Cir. 1957) ................................................................ 57

*United States v. Wrightwood Dairy Co.*,
    315 U.S. 110 (1942) ................................................................ 30

*Varga v. United States*,
    467 F. Supp. 1113 (D. Md. 1979) ................................................................ 49, 54

*Veazie Bank v. Fenno*,
    75 U.S. (8 Wall.) 533 (1869) ................................................................ 57

*Walz v. Tax Comm'n*,
    397 U.S. 664 (1970) ................................................................ 48

*Ward v. Comm'r,*
  608 F.2d 599 (5th Cir. 1979) .................................................................. 54

*Wash. State Grange v. Wash. State Republican Party,*
  552 U.S. 442 (2008) ............................................................................... 23

*Washington v. Davis,*
  426 U.S. 229 (1976) ............................................................................... 52

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990) ............................................................................... 12

*Wickard v. Filburn,*
  317 U.S. 111 (1942) ...................................................... 23, 24, 25, 32, 33, 56

**Constitution and Statutes:**

U.S. Const. amend. I ....................................................................................... 48

U.S. Const. amend. XIV ................................................................................. 55

U.S. Const. amend. XVI ........................................................................... 55, 59

U.S. Const. art. I, § 2, cl. 3 ............................................................................. 55

U.S. Const. art. I, § 8, cl. 1 ............................................................................. 34

U.S. Const. art. I, § 8, cl. 3 ............................................................................. 23

U.S. Const. art. I, § 8, cl. 18 ........................................................................... 29

U.S. Const. art. I, § 9, cl. 4 ............................................................................. 55

15 U.S.C. §§ 1011-1015 ................................................................................. 28

15 U.S.C. § 1201(b) ....................................................................................... 28

26 U.S.C. § 1402(g)(1) ............................................................... 49, 50, 51, 53, 54

26 U.S.C. § 4980B ......................................................................................... 36

26 U.S.C. § 4980D ......................................................................................... 36

26 U.S.C. § 5000A .................................................................................. passim

26 U.S.C. § 6671(a) ....................................................................................... 21

26 U.S.C. § 7421(a) ............................................................................................... 21

26 U.S.C. §§ 9801-03 ..................................................................................... 26, 36

28 U.S.C. § 2201(a) ............................................................................................... 22

29 U.S.C. § 1181(a) ............................................................................................... 26

29 U.S.C. § 1182 ................................................................................................... 26

42 U.S.C. §§ 300gg ............................................................................................... 26

42 U.S.C. § 1395dd ............................................................................................... 30

42 U.S.C. § 2000bb-1 ............................................................................................ 42

42 U.S.C. § 2000bb-1(a) ........................................................................................ 43

42 U.S.C. § 2000bb-1(b) ................................................................................... 42, 43

Pub. L. No. 93-406, 88 Stat. 829 (1974) ................................................................ 26

Pub. L. No. 99-272, 100 Stat. 82 (1985) ................................................................ 26

Pub. L. No. 103-141, 107 Stat. 1488 (1993) .......................................................... 42

Pub. L. No. 104-191, 110 Stat. 1936 (1996) .......................................................... 26

Pub. L. No. 104-204, 110 Stat. 2944 (1996) .......................................................... 26

Pub. L. No. 104-204, 110 Stat. 2935 (1996) .......................................................... 26

Pub. L. No. 105-277, 112 Stat. 2681 (1998) .......................................................... 26

Pub. L. No. 110-343, 122 Stat. 3765 (2008) .......................................................... 26

Pub. L. No. 111-148, 124 Stat. 119 (2010):

    § 1001 ............................................................................................................. 9
    § 1201 ......................................................................................................... 9, 27
    § 1303 ...................................................................................................... passim
    § 1311 ............................................................................................................. 8
    § 1401 ......................................................................................................... 8, 13
    § 1402 ............................................................................................................. 8
    § 1421 ......................................................................................................... 8, 36

§ 1501................................................................................................................passim
§ 1513..........................................................................................................8, 13, 15
§ 2001......................................................................................................................8
§ 9001....................................................................................................................36
§ 10101(a)...............................................................................................................9
§ 10106(a).....................................................................................................passim

Pub. L. No. 111-152, 124 Stat. 1029 (2010).........................................................9, 35

**Legislative Materials:**

H.R. Rep. No. 111-443 (2010)..............................................................................passim

S. Rep. No. 89-404 (1965)........................................................................................49

S. Rep. No. 111-89 (2009)........................................................................................31

**Miscellaneous:**

Bruce Ackerman, *Taxation and the Constitution,* 99 Colum. L. Re*v.* 1 (Jan. 1999)..............57, 58

Cong. Budget Office, Key Issues in Analyzing Major Health Insurance Proposals
    (Dec. 2008)..................................................................................................passim

Cong. Budget Office, The Long-Term Budget Outlook (June 2009).............................6

Letter from Douglas W. Elmendorf, Director, Cong. Budget Office, to the Hon. Nancy Pelosi,
Speaker, U.S. House of Representatives (Mar. 20, 2010) ..................................6, 10, 37

*Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm. on
Ways and Means,* 111th Cong. (2009) ................................................................28, 31

*47 Million & Counting: Why the Health Care Market Place Is Broken: Hearing Before the S.
Comm. On Finance,* 110th Cong. (2008)..............................................................31, 32

## PRELIMINARY STATEMENT

Plaintiffs—a non-profit Christian university, a physician, two state and local legislators, and two other individuals—invoke at least twelve separate constitutional provisions or federal statutes in an effort to overturn a federal law they plainly oppose.  Federal courts, however, are courts of limited jurisdiction.  They do not referee political disputes.  They decide specific cases or controversies, brought by a party with standing to sue predicated on a concrete injury in fact. Plaintiffs do not come close to satisfying this most basic prerequisite of federal jurisdiction.  The minimum coverage provision that plaintiffs assault—Section 1501 of the Patient Protection and Affordable Care Act ("ACA" or "the Act"), requiring non-exempted individuals either to obtain a minimum level of health insurance or to pay a penalty—does not take effect until 2014, and when it does take effect, plaintiffs cannot show that it will affect them.  The employer responsibility provision that plaintiffs attack likewise does not take effect until 2014.  Although plaintiffs claim injury from various other provisions of the new law concerning, for example, the Medicare, Medicaid, and federal student loan programs, they do not assert that these provisions are unconstitutional.  Plaintiffs appear to contend that they are invalid anyway.  Plaintiffs' disapproval, however, does not have legal force, nor does their preference that the Act not apply to them confer standing to sue.  Nor is this plaintiffs' only jurisdictional defect.  Their challenges to the minimum coverage provision are not ripe and are barred by the Anti-Injunction Act.

Even if this Court had subject matter jurisdiction, plaintiffs' claims still would fail because Congress, in adopting the minimum coverage provision, acted well within its authority under the Commerce Clause and the Necessary and Proper Clause. The ACA effected

1

comprehensive reforms of the interstate health insurance market. And Congress determined that, without the minimum coverage provision, these market reforms, such as the ban on denying coverage or increasing premiums based on an individual's preexisting medical condition, would not work. To the contrary, Congress found, they would amplify existing incentives for individuals to "wait to purchase health insurance until they needed care," shifting even greater costs onto third parties. Pub. L. No. 111-148, §§ 1501(a)(2)(I), 10106(a). Congress thus determined that the minimum coverage provision "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." *Id*.

Congress further understood, and plaintiffs do not deny, that virtually everyone at some point needs medical services, which cost money. The ACA regulates economic decisions about how to pay for those services—whether to pay in advance through insurance or to attempt to do so later out of pocket—decisions that, "in the aggregate," without question substantially affect the vast, interstate health care market. *Gonzales v. Raich*, 545 U.S. 1, 22 (2005).

More than 45 million Americans have neither private health insurance nor the protection of government programs such as Medicare or Medicaid. Many of these individuals are uninsured because they cannot afford coverage. Others are excluded by insurers' restrictive underwriting criteria. Still others make the economic decision to forgo health insurance altogether with the backdrop of "free" health care in the event of a critical illness or accident. Forgoing health insurance, however, is not the same as forgoing health care. When accidents or illnesses inevitably occur, the uninsured still receive some degree of medical assistance, even if

2

they cannot pay.  As Congress documented, the cost of such uncompensated health care—$43 billion in 2008 alone—is passed on to the other participants in the health care market: health care providers, insurers, the insured population, governments, and taxpayers.  Pub. L. No. 111-148, §§ 1501(a)(2)(F), 10106(a).  For these reasons, Congress's authority under the Commerce Clause and the Necessary and Proper Clause to adopt the minimum coverage provision is clear.

In addition, Congress has independent authority to enact the ACA as an exercise of its power under the General Welfare Clause of Article I, Section 8.  *License Tax Cases*, 72 U.S. (5 Wall.) 462, 471 (1867).  The minimum coverage provision will raise revenue, and is therefore valid under longstanding precedent, even though Congress also had a regulatory purpose in enacting the provision.  It is equally well-established that a tax predicated on an event—such as a decision not to purchase health insurance—is not a "direct tax" subject to apportionment under Article I, Sections 2 and 9.  *United States v. Mfrs. Nat'l Bank of Detroit*, 363 U.S. 194, 196-97 (1960).

Plaintiffs' remaining assortment of claims fares no better.  Liberty challenges the requirement that certain large employers, starting in 2014, must pay an assessment if they do not offer adequate health insurance to their full-time employees and have a full-time employee who receives a premium tax credit in a health insurance Exchange.  But it has been settled for decades that Congress has power under the Commerce Clause to regulate the terms and conditions of employment.

Nor does plaintiffs' jumble of First Amendment claims present any issues of substance. Plaintiffs insist that the minimum coverage provision and the employer responsibility provision

violate the First Amendment's Free Exercise Clause and the Religious Freedom Restoration Act ("RFRA"), apparently because plaintiffs believe that in 2014 they will be required to purchase insurance from plans that cover abortion services. But, as required by statute, *see* Pub. L. No. 111-148, § 1334(a)(6), in 2014, plaintiffs will have the option of purchasing a "multi-state" plan in a health insurance Exchange that does not provide coverage for abortion services except in cases of rape or incest or where the life of the woman is endangered. And it is possible that plaintiffs will be able to purchase insurance from a plan that does not cover abortions at all. *Id.* § 1303(a)(1), (b)(1)(A)(i). Even if plaintiffs decide to purchase insurance from a plan that covers non-excepted abortion services, payments by enrollees for coverage of non-excepted abortion services must be separated from payments by enrollees for coverage of other services, and payments for the latter may not be used to pay for non-excepted abortion services. *Id.* § 1303(b)(2)(C)(ii)(II). In any event, it is well-settled that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Emp't Div. v. Smith*, 494 U.S. 872, 879 (1990) (internal citation and quotation marks omitted). RFRA likewise provides no support to plaintiffs here, as the minimum coverage provision imposes no burden on religious exercise.

Plaintiffs' claim that the employer responsibility provision and the minimum coverage provision infringe their First Amendment rights of free association and free speech imports imaginary requirements into the ACA. If plaintiffs object to the coverage provided by certain insurance plans, plaintiffs are perfectly free not to purchase insurance from those plans. Plaintiff

Liberty in its capacity as an employer currently "associates" voluntarily with insurance plans it considers acceptable. There is no reason to assume it will be unable to find acceptable plans in 2014. And a required purchase of a minimum level of insurance coverage no more subsidizes the speech of insurers than the purchase of milk subsidizes the speech of the dairy farmer.

Finally, plaintiffs assert that the exemptions from the minimum coverage provision for those conscientiously opposed to the purchase of insurance violate the Establishment Clause and the Equal Protection Clause. But the law is clear that Congress may accommodate conscientious objectors without running afoul of the Establishment Clause. Nor do the exemptions violate the Equal Protection Clause, as plaintiffs plainly cannot show—as they must—that Congress intended to discriminate among religions in enacting the carefully circumscribed exemptions to the minimum coverage provision.

In sum, because plaintiffs lack standing to sue, this case does not call upon the Court to judge the "constitutionality of an Act of Congress"—"'the gravest and most delicate duty'" a court may undertake. *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2513 (2009) (quoting *Blodgett v. Holden,* 275 U.S. 142, 147-48 (1927) (Holmes, J., concurring)). Even if the Court were to undertake that task, however, clear precedent establishes that the minimum coverage provision and the employer responsibility provision fall within Congress's authority to regulate interstate commerce, as well as its power to collect revenue and make expenditures for the general welfare. Neither provision offends the First or Fifth Amendments, nor any other indiscriminate litany of legal requirements.

5

Accordingly, defendants' Motion to Dismiss should be granted.[1]

# BACKGROUND

## A.    Statutory Background

In 2009, the United States spent more than 17 percent of its gross domestic product on health care according to projections.    Pub. L. No. 111-148, §§ 1501(a)(2)(B), 10106(a). Notwithstanding these extraordinary expenditures, 45 million people—an estimated 15% of the population—went without health insurance in 2009, and, absent the new legislation, that number would have climbed to 54 million by 2019.  Cong. Budget Office ("CBO"), 2008 Key Issues in Analyzing Major Health Proposals 11 (Dec. 2008) [hereinafter Key Issues]; *see also* CBO, The Long-Term Budget Outlook 21-22 (June 2009); Letter from Douglas W. Elmendorf, Director, Cong. Budget Office ("CBO"), to the Hon. Nancy Pelosi, Speaker, U.S. House of Representatives, tbl. 4 at 21 (Mar. 20, 2010) [hereinafter CBO Letter].

---

[1]  On August 2, 2010, Judge Henry E. Hudson, in the Eastern District of Virginia, issued a procedural decision denying the United States' motion to dismiss in *Virginia v. Sebelius*, No. 3:10-cv-00188, 2010 WL 2991385 (E.D. Va. Aug. 2, 2010).  That court held that it had subject matter jurisdiction to hear the Commonwealth's challenge to the ACA.  The defendants contend that this holding was clear error, but in any event, it rested on grounds unique to the plaintiff's status as a state.  It therefore sheds no light on the jurisdictional questions in this case, which involve private parties only.

Notably, Judge Hudson did not rule on the merits of the Commonwealth's claim.  Rather, he deferred a decision on the merits, denying the motion to dismiss because there was an "arguable legal basis" for the Commonwealth's claim on which he desired further briefing.  *Id.* at *12.  For the reasons stated elsewhere in this brief, plaintiffs' claims fail under well-settled law. But even if this Court were to consider the legal questions to be closer, a dispute of law provides no basis to deny a motion to dismiss.  This Court must decide questions of law such as those presented here on a Rule 12(b)(6) motion, and if the plaintiff fails to state a claim under the governing law, the court must dismiss the complaint, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."  *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).

The record before Congress documents the staggering costs that a broken health care system visits on individual Americans and the nation as a whole.  Millions who have no health insurance coverage still receive medical care, but often cannot pay for it.  The costs of that uncompensated care are shifted to the government, taxpayers, insurers, and the insured.  But cost-shifting is not the only harm imposed by the lack of insurance.  Congress found that the "economy loses up to $207,000,000,000 a year because of the poorer health and shorter lifespan of the uninsured," Pub. L. No. 111-148, §§ 1501(a)(2)(E), 10106(a), and that medical expenses cause, at least in part, 62 percent of all personal bankruptcies, *id*. §§ 1501(a)(2)(G), 10106(a). All these costs, Congress determined, substantially affect interstate commerce.  *Id*. §§ 1501(a)(2)(F), 10106(a).

In order to remedy this overriding problem for the American economy, the Act comprehensively "regulates activity that is commercial and economic in nature: economic and financial decisions about how and when health care is paid for, and when health insurance is purchased." *Id*. §§ 1501(a)(2)(A), 10106(a).  First, to address inflated fees and premiums in the individual and small-business insurance market, Congress established health insurance Exchanges "as an organized and transparent marketplace for the purchase of health insurance where individuals and employees (phased-in over time) can shop and compare health insurance options."  H.R. Rep. No. 111-443, pt. II, at 976 (2010) (quotation omitted).  The Exchanges coordinate participation and enrollment in health plans, implement procedures to certify qualified health plans, and provide consumers with needed information, including by maintaining an

7

Internet website through which enrollees and prospective enrollees in qualified health plans may obtain standardized comparative information on plans. Pub. L. No. 111-148, § 1311.

Second, the Act builds on the existing system of employer-based health insurance, in which most individuals receive coverage as part of their employee compensation. *See* CBO, Key Issues, at 4-5. It creates a system of tax incentives to encourage small businesses to purchase health insurance for their employees. It also imposes potential penalties on certain large businesses that do not provide adequate coverage to their full-time employees if a full-time employee receives a tax credit in a health insurance Exchange. Pub. L. No. 111-148, §§ 1421, 1513. The employer responsibility provision of section 1513 of the Act will prevent "employers who do not offer health insurance to their workers" from gaining "an unfair economic advantage relative to those employers who do provide coverage." H.R. Rep. No. 111-443, pt. II, at 985-86.

Third, the Act provides financial assistance with the purchase of health insurance coverage for a large portion of the uninsured population. As Congress understood, nearly two-thirds of the uninsured are in families with income less than 200 percent of the federal poverty level, H.R. Rep. No. 111-443, pt. II, at 978 (2010); *see also* CBO, Key Issues, at 27, while only 4 percent of those with income greater than 400 percent of the poverty level are uninsured. CBO, Key Issues, at 11. The Act reduces this gap by providing premium tax credits and reduced cost-sharing in health insurance Exchanges for individuals and families with income between 100 and 400 percent of the federal poverty line, Pub. L. No. 111-148, §§ 1401-02, and expanding eligibility for Medicaid to individuals with income below 133 percent of the federal poverty level beginning in 2014. *Id.* § 2001.

8

Fourth, the Act removes barriers to insurance coverage.  It prohibits widespread insurance industry practices, like refusing to cover or charging more to individuals with pre-existing medical conditions, which increase premiums—or deny coverage entirely—to those in greatest need of health care.  Pub. L. No. 111-148, § 1201.  The Act also prevents insurers from rescinding coverage for any reason other than fraud or intentional misrepresentation of material fact, or declining to renew coverage based on health status.  *Id.* §§ 1001, 1201.  And it prohibits caps on the amount of coverage available to a policyholder in a given year or over a lifetime.  *Id.* §§ 1001, 10101(a).

Finally, the Act requires that all Americans, with specified exceptions, maintain a minimum level of health insurance coverage, or pay a penalty.  *Id.* §§ 1501, 10106.[2]  Congress found that this provision "is an essential part of this larger regulation of economic activity," and that its absence "would undercut Federal regulation of the health insurance market."  *Id.* §§ 1501(a)(2)(H), 10106(a).  That express legislative judgment rested on a number of equally definitive Congressional findings.  Congress found that, by "significantly reducing the number of the uninsured, the requirement, together with the other provisions of this Act, will lower health insurance premiums."  *Id.* §§ 1501(a)(2)(F), 10106(a).  Conversely, and importantly, Congress also found that, without the minimum coverage provision, the reforms in the Act, such as the ban on denying coverage or charging more based on pre-existing conditions, would amplify existing incentives for individuals to "wait to purchase health insurance until they needed care," thereby further shifting costs onto third parties.  *Id.* §§ 1501(a)(2)(I), 10106(a).  Congress thus

---

[2]  These provisions have been amended by the Health Care and Education Reconciliation Act of 2010 ("HCERA"), Pub. L. No. 111-152, § 1002, 124 Stat. 1029, 1032.

determined that the minimum coverage provision "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." *Id*.

The CBO projects that the reforms in the Act will reduce the number of uninsured Americans by approximately 32 million by 2019. CBO Letter at 9. It further projects that the Act's combination of reforms and tax credits will reduce the average premium paid by individuals and families in the individual and small group markets. *Id*. at 15; CBO, An Analysis of Health Insurance Premiums Under the Patient Protection and Affordable Care Act 23-25 (Nov. 30, 2009). And the CBO estimates that the interrelated revenue and spending provisions in the Act will yield net savings to the federal government of more than $100 billion over the next decade. CBO Letter at 2.

## B.    Current Proceedings

The day the ACA was signed into law, plaintiffs Liberty University, a non-profit Christian University, a physician, two state and local legislators, and five other individuals sued defendants Timothy Geithner, Secretary of the Department of the Treasury; Kathleen Sebelius, Secretary of the Department of Health and Human Services; Hilda Solis, Secretary of the Department of Labor; and Eric Holder, Attorney General of the United States. Plaintiffs filed a first amended complaint on April 14, 2010, and a second amended complaint on July 30, 2010, which dropped three of the individual plaintiffs from the case.

Plaintiffs claim that the Act's minimum coverage provision and employer responsibility provision exceed Congress's power under the Constitution, Second Am. Compl. ¶¶ 95-107, and

that the minimum coverage provision constitutes a direct tax or capitation tax not apportioned among the states as required by Article I, Sections 2 and 9 of the Constitution, *id.* ¶¶ 172-76.  In addition, plaintiffs raise challenges under the Tenth Amendment, *id.* ¶¶ 108-19, the Establishment Clause, *id.* ¶¶ 120-30, the Free Exercise Clause, *id.* ¶¶ 131-49, the Religious Freedom Restoration Act, *id.* ¶¶ 150-54, the Equal Protection Clause, *id.* ¶¶ 155-64, the Free Speech Clause, *id.* ¶¶ 165-71, and the Guarantee Clause, *id.* ¶¶ 177-83.

## ARGUMENT

## I.   STANDARD OF REVIEW

Defendants move to dismiss the complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  Plaintiffs "bear[] the burden of proving that subject-matter jurisdiction exists."  *The Piney Run Pres. Ass'n v. The Cnty. Comm'rs of Carroll Cnty., MD*, 523 F.3d 453, 459 (4th Cir. 2008).  Where, as here, the defendant challenges jurisdiction on the face of the complaint, the complaint must plead sufficient facts to establish that jurisdiction exists.  This Court must determine whether it has subject-matter jurisdiction before addressing the merits of the complaint.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).

Defendants also move to dismiss every count in the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  Under this Rule, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## II.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CHALLENGES TO THE MINIMUM COVERAGE AND EMPLOYER RESPONSIBILITY PROVISIONS

Federal courts sit to decide cases and controversies, not to resolve disagreements on policy or politics. Indeed, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (citation and internal quotation omitted). Plaintiffs' challenge to the minimum coverage provision does not satisfy the most basic prerequisite of a case or controversy under Article III, a claimant with standing to sue. Plaintiffs lack standing because they have no injury, and their claims are unripe. In addition, plaintiffs' suit is barred by the Anti-Injunction Act.

### A.    Plaintiffs lack standing because the minimum coverage provision and the employer responsibility provision do not take effect until 2014

To establish standing, "the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations, quotation marks, and footnote omitted). To meet this requirement, the harm must be "distinct and palpable." *GBA Assocs. v. Gen. Servs. Admin.*, 32 F.3d 898, 900 (4th Cir. 1994). "Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (internal citation and quotation omitted). A plaintiff who

"alleges only an injury at some indefinite future time" has not shown an injury in fact, particularly where "the acts necessary to make the injury happen are at least partly within the plaintiff's own control." *Lujan*, 504 U.S. at 564 n.2.  In these situations, "the injury [must] proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." *Id.*

Plaintiff Liberty University describes itself as a non-profit corporation "whose employees and trustees share a common set of ethical or religious beliefs."  Second Am. Compl. ¶ 57. Liberty says that it is injured by the employer responsibility provision—which, beginning in 2014, will require large employers to offer adequate coverage to their employees or pay a penalty if a full-time employee receives a tax credit in an Exchange.[3]

But the employer responsibility provision will have no effect until January 1, 2014.  Even in 2014, if Liberty elects not to provide adequate health insurance to its full-time employees and a full-time employee receives a tax credit in an Exchange, it generally would not have to pay the

---

[3] Starting in 2014, section 1513 of the ACA imposes assessments on certain large businesses that offer insurance to their employees if a full-time employee receives a premium tax credit in an Exchange because (1) the employee's employer-sponsored coverage is not "affordable" (defined as exceeding 9.5 percent of the employee's household income) or (2) the employer coverage does not provide a minimum value (i.e., where the plan offered by the employer pays for less than 60 percent of covered health care expenses).  Pub. L. No. 111-148, § 1513 (adding 26 U.S.C. § 4980H) and Pub. L. No. 111-148 § 1401.

The amount of the penalty varies.  If the employer does *not* offer coverage for a given month, and any of its full-time employees receives a premium tax credit in an Exchange for that month, a penalty of $167 for *every* full-time employee is assessed for that month, excluding the first 30 employees.  I.R.C. § 4980H(a), (c)(2)(D)(i)(I).  If the employer *does* offer coverage for a given month, and any of its full-time employees receives a premium tax credit in an Exchange for that month, a penalty of $250 for *each such* employee is assessed for that month (but no more than the penalty would have been if the employer had not offered coverage at all).  I.R.C. § 4980H(b)(1), (2).

penalty until 2015. This alleged injury is "too remote temporally" to support standing. *See McConnell v. FEC*, 540 U.S. 93, 226 (2003) (Senator's claimed injury of desire to air advertisements five years in the future was "too remote temporally" to sustain standing), *overruled in part on other grounds by Citizens United v. FEC*, 130 S. Ct. 876 (2010). The individual plaintiffs—Ms. Waddell and Ms. Merrill—lack standing for the same reason. They object to the ACA's minimum coverage provision—which will require non-exempted individuals to obtain qualifying health insurance or pay a penalty—but this requirement too will not take effect until 2014, and any penalty generally would not be due until April 2015.

It is no response that the employer responsibility provision and the minimum coverage provision are certain to take effect in 2014. The issue is not whether the provisions will affect someone. It is whether it will cause injury to *these plaintiffs*. Indeed, Liberty contends only that it "*could be* determined" to be out of compliance with the employer responsibility provision and thus "*could be*" subject to the Act's penalties. *Id.* ¶ 62 (emphasis added). These "could be's" underscore plaintiffs' lack of standing. Liberty admits that it "makes available health savings accounts, private insurance policies and other healthcare reimbursement options to qualified employees." Second Am. Compl. ¶ 29. Liberty's current coverage may satisfy the employer responsibility provision when it goes into effect. Moreover, even if Liberty were certain not to offer sufficient coverage in 2014, it would not necessarily be subject to the penalty. For an employer to be subject to the penalty, at least one of its full-time employees must receive a premium tax credit to assist with the purchase of a qualifying health plan on an Exchange.

14

Liberty does not allege, and it is not possible now reliably to predict, that this will occur.  Pub. L.

No. 111-148, § 1513.[4]

The individual plaintiffs' asserted injuries from the minimum coverage provision are

equally speculative.  Ms. Waddell and Ms. Merrill express no religious or other objection to

health insurance per se and, although they may not now be insured, personal situations can

change dramatically over four years.  These plaintiffs might satisfy the minimum coverage

provision by finding employment in which they receive health insurance as a benefit.  Or they

---

[4]  Plaintiffs cannot improvise standing to challenge the employer responsibility provision by claiming immediate injury resulting from provisions that take effect sooner—specifically, the student loan related provisions of the HCERA and various provisions of the ACA that take effect in 2011.  Second Am. Compl. ¶¶ 63-65, 89-92.  Plaintiffs do not (and cannot credibly) assert that these provisions are unconstitutional.  And "a plaintiff must establish that he has standing to challenge *each provision* of an ordinance by showing that he was injured by application of those provisions."  *Covenant Media of S.C. v. City of N. Charleston*, 493 F.3d 421, 430 (4th Cir. 2007) (emphasis added); *see also Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("[S]tanding is not dispensed in gross.").

Even if plaintiffs could bootstrap an injury from one (concededly legal) statutory provision into standing to challenge another purportedly unlawful one, Liberty's premise—that the student loan provisions it mentions are not severable from the minimum coverage and employer responsibility provisions at the core of its blunderbuss attack—is specious.  Under the severability test, "the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted."  *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987).  The HCERA's student loan components are distinct from the ACA's reforms of the health care and health insurance markets, and it is beyond question that the student loan provisions could exist independently of the ACA's coverage provisions.  *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3161 (2010) (severing unconstitutional provisions because "[t]he Sarbanes-Oxley Act remains fully operative as a law with these tenure restrictions excised") (citation and internal quotation omitted).  It is true, as plaintiffs point out, that the HCERA contains no severability language, but "[i]n the absence of a severability clause . . . Congress's silence is just that—silence—and does not raise a presumption against severability."  *Alaska Airlines*, 480 U.S. at 686.  In fact, the presumption is just the opposite.  *See PCAOB*, 130 S. Ct. at 3161 ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem.") (internal citation omitted).  A decision invalidating the ACA would therefore not redress plaintiffs' alleged injuries.

might get insurance by qualifying for Medicaid. Although Ms. Waddell asserts that she is "generally healthy" and intends to pay for health care services as she needs them, Second Am. Compl. ¶ 34, she could contract a serious illness or suffer an accident requiring expensive medical treatments and then decide to purchase a policy. Or plaintiffs might qualify for one of the Act's exemptions covering, for example, those who "cannot afford coverage," or who would suffer financial hardship if required to purchase insurance. Pub. L. No. 111-148, § 1501 (adding 26 U.S.C. § 5000A(e)(1) and (5)).

Furthermore, it is possible that upon reviewing the yet-to-be-created menu of qualified health plans, plaintiffs will find one or more that provides adequate "control of" their "healthcare decisions," Second Am. Compl. ¶ 38, leading plaintiffs to buy insurance, particularly if they qualify for the financial assistance provided by the Act. Moreover, it is a certainty that a plan will be available that does not provide non-excepted abortion coverage, Pub. L. No. § 1334(a)(6), and it is possible that plans will be available that do not cover abortion services at all, *id.* § 1303(a)(1), (b)(1)(A)(i).

If plaintiffs, in 2014, have not otherwise satisfied the minimum coverage provision and choose not to purchase health insurance, they can pay the resulting penalty and challenge the provision in a suit for a refund. As of now, however, any harm that plaintiffs might suffer is remote rather than imminent, speculative rather than concrete, and "at least partly within [their] own control." *Lujan*, 504 U.S. at 564 n.2. "Given the speculative nature of any prospective injury to plaintiffs, a court should refrain from reviewing the merits . . . until a proper

16

controversy arises." *Comite de Apoyo a los Trabajadores Agricolas v. Dep't of Labor*, 995 F.2d 510, 515 (4th Cir. 1993).

The two legislator plaintiffs—Delegate Byron and Council Member Helgeson—lack standing for a different reason.  The injuries they allege are wholly institutional and ideological; neither plaintiff points to any injury suffered in an individual capacity.  Delegate Byron "objects" to the ACA because it "dramatically alter[s] the balance of powers between the federal and state governments," purportedly "violat[ing] Delegate Byron's rights as an elected representative of the people of the Commonwealth of Virginia."  Second Am. Compl. ¶¶ 12, 40.  Likewise, Council Member Helgeson—a member of the Lynchburg City Council—"objects to the Act and Reconciliation Act and the injury they will do to the employers and citizens of his City."  *Id.* ¶ 13.  But these allegations frame policy objections, not particularized injuries.  These plaintiffs cannot manufacture standing by withholding consent from a specific law enacted through the democratic process.  And "moral outrage, however profoundly and personally felt, does not endow [plaintiffs] with standing to sue."  *Smelt v. Cnty. of Orange*, 447 F.3d 673, 685 (9th Cir. 2006).

Nor may plaintiffs Byron or Helgeson base standing on their status as legislators.  In *Raines v. Byrd*, members of Congress challenged the constitutionality of the Line Item Veto Act, claiming that they were injured because the Act "alter[ed] the legal and practical effect of all votes they may cast on bills containing . . . separately vetoable items," "divest[ed] [them] . . . of their constitutional role in the repeal of legislation," and "alter[ed] the constitutional balance of powers."  521 U.S. 811, 816 (1997).  The Court denied standing, reasoning that the legislators'

17

claimed injury "necessarily damages all Members of Congress and both Houses of Congress equally." *Id.* at 821. Emphasizing that the plaintiffs did "not claim that they [had] been deprived of something to which they *personally* [were] entitled," the Court held that a "claim of standing . . . based on a loss of political power" is not a legally cognizable injury. *Id.* The individual legislators accordingly lacked standing. The same is true here.[5]

Plaintiff Stein, a Milwaukee physician, also lacks standing. Dr. Stein asserts that he "oppose[s] a federal overhaul of the health care system" and "disagree[s]" that the ACA will reduce costs and improve quality of care. Second Am. Compl. ¶ 36. These allegations are also policy objections, and are also directed to the wrong forum.

Aside from his unhappiness with this particular product of majority rule, Dr. Stein also asserts that he has relationships with "numerous private insurance plans" and six hospital affiliations. *Id.* ¶ 35. According to Dr. Stein, "[i]mplementation of the Act . . . including the additional layers of bureaucratic regulation imposed upon practitioners, will interfere with Dr. Stein's liberty interest in practicing his profession and providing essential health care services for his patients." *Id.* But any doctor could raise these vague and conclusory allegations. Dr. Stein does not explain how the ACA will affect his relationships with insurance plans and his

---

[5]  Delegate Byron cannot avoid this conclusion by citing her vote in favor of Bill H.10, a recently-enacted Virginia statute purporting to grant Virginians the right not to purchase health insurance. Second Am. Compl. ¶ 39. It is true that "[s]tate legislators have standing to contest a decision holding a state statute unconstitutional if state law authorizes legislators to represent the State's interests." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 65 (1997); *Karcher v. May*, 484 U.S. 72, 82 (1987). But here, there has been no decision "holding a state statute unconstitutional," *Arizonans for Official English*, 520 U.S. at 65, nor does Delegate Byron allege that state law authorizes her to represent Virginia's interests. *Id.* To be sure, the Eastern District of Virginia has permitted a suit brought by the Commonwealth of Virginia to proceed based in part on this Virginia statute, but as explained above, Delegate Byron does not stand in the same position as the Commonwealth.

affiliations with hospitals, much less how any such effects are the necessary byproduct of illegal action by defendants. He does not say how the ACA's "layers of bureaucratic regulation" will affect his practice or his relationships with his patients, much less why these unidentified "layers" are unlawful. And he does not cite any specific provision of the ACA that currently harms him or is very likely to do so in the near future. As such, these "mere conclusory statements," *Iqbal*, 129 S.Ct. at 1949, do not suffice to show an injury in fact, nor do they satisfy the minimal pleading standards of Federal Rule of Civil Procedure 8, which require that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 570).

This case should be dismissed for lack of standing.

**B.      Plaintiffs' claims are unripe**

For similar reasons, plaintiffs' challenges to the employer responsibility provision and the minimum coverage provision are not ripe for review. The ripeness inquiry "evaluate[s] both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006); *see also Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (claim is not ripe if it rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all" (citation and internal quotation omitted)). Similarly, "[t]he hardship prong is measured by

the immediacy of the threat and the burden imposed on the [plaintiffs] who would be compelled to act under threat of enforcement of the challenged law." *Miller*, 462 F.3d at 319 (citation and internal quotation omitted); *see also Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 17-18 (D.D.C. 2001) ("[W]ith respect to the 'hardship to the parties' prong, an abstract harm is not sufficient; there must be an immediate harm with a 'direct effect on the day-to-day business of the plaintiffs.'") (quoting *Texas v. United States*, 523 U.S. 296, 301 (1998)). Plaintiffs' challenges satisfy neither prong of the ripeness inquiry because no injury could occur before 2014, and plaintiffs cannot show that one will occur even then.

To be sure, "[w]here the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Blanchette v. Conn. Gen. Ins. Corp.*, 419 U.S. 102, 143 (1974). However, in contrast to *Blanchette*, any injury to plaintiffs here is far from "inevitabl[e]." Nor is this a case like *Abbott Laboratories*, where the plaintiffs demonstrated "a direct effect on [their] day-to-day business." *Abbott Labs.*, 387 U.S. at 152. This case instead involves "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas*, 473 U.S. at 580-81. Even where, as here, the issue presented is "a purely legal question," *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163 (1967), such uncertainty whether a statutory provision will harm the plaintiffs renders the controversy unripe. *Id.* at 163-64. If plaintiffs' circumstances change after adjudication of their claims, this Court would needlessly have rendered an advisory opinion. That is precisely what the ripeness requirement is designed to avoid.

### C.    The Anti-Injunction Act bars plaintiffs' claims

Even if plaintiffs had an injury in fact and presented a ripe claim, the Anti-Injunction Act, 26 U.S.C. § 7421(a) ("AIA"), would bar their claim for relief.  Plaintiffs specifically allege that the penalty under the minimum coverage provision is an unconstitutional tax, Second Am. Compl. ¶¶ 172-76, and they seek to restrain its assessment and collection.  Plaintiffs' claims by their terms thus fall within the scope of the AIA, which provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed."  26 U.S.C. § 7421(a).

Even if plaintiffs did not so explicitly lodge their claims as a challenge to a potential tax penalty, the AIA would still bar the relief they seek.  Whether or not the penalty here is labeled a tax, it is, with exceptions not material here, "assessed and collected in the same manner" as other penalties under the Internal Revenue Code, 26 U.S.C. § 5000A(g)(1), and, like these other penalties, it falls within the bar of the AIA.  26 U.S.C. § 6671(a); *see, e.g.*, *Barr v. United States*, 736 F.2d 1134, 1135 (7th Cir. 1984) (per curiam) ("Section 6671 provides that the penalty at issue here is a tax for purposes of the Anti-Injunction Act.").  That result is consistent with the purpose of the AIA—to preserve the Government's ability to collect such assessments expeditiously with "a minimum of preenforcement judicial interference" and "to require that the legal right to the disputed sums be determined in a suit for refund."  *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974) (citation and internal quotation omitted).

21

Under the AIA, as well as the Declaratory Judgment Act,[6] district courts lack jurisdiction to order the abatement of any such liability under the Internal Revenue Code except in validly-filed claims for refund.  *See Bartley v. United States*, 123 F.3d 466, 467 (7th Cir. 1997).  These jurisdictional limitations apply even where, as here, plaintiffs raise a constitutional challenge to a statute that imposes a penalty:

> The "decisions of this Court make it unmistakably clear that the constitutional nature of a taxpayer's claim . . . is of no consequence" to whether the prohibition against tax injunctions applies.  This is so even though the Anti-Injunction Act's prohibitions impose upon the wronged taxpayer requirements at least as onerous as those mandated by the refund scheme—the taxpayer must succumb to an unconstitutional tax, and seek recourse only after it has been unlawfully exacted.

*United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 10 (2008) (quoting *Alexander v. "Americans United" Inc.*, 416 U.S. 752, 759 (1974).

The Anti-Injunction Act therefore bars plaintiffs' effort to enjoin collection of the minimum coverage penalty.

## III.    THE MINIMUM COVERAGE PROVISION AND THE EMPLOYER RESPONSIBILITY PROVISIONS FALL WITHIN CONGRESS'S CONSTITUTIONAL AUTHORITY UNDER THE COMMERCE CLAUSE AND, INDEPENDENTLY, THE GENERAL WELFARE CLAUSE

Even if this Court had subject-matter jurisdiction, plaintiffs' constitutional challenge would fail on the merits.  "Due respect for the decisions of a coordinate branch of Government demands that [this Court] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds."  *United States v. Morrison*, 529 U.S. 598, 607

---

[6]    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), similarly provides district courts jurisdiction to grant declaratory relief "except with respect to Federal taxes."  As the Supreme Court noted in *Bob Jones University*, the tax exception to the Declaratory Judgment Act demonstrates the "congressional antipathy for premature interference with the assessment or collection of any federal tax."  416 U.S. at 732 n.7.

(2000).  Moreover, in presenting a facial challenge to a federal statute, a plaintiff may prevail only "by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications."  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno,* 481 U.S. 739, 745 (1987)).  Plaintiffs can make no such showing.  The minimum coverage and employer responsibility provisions pass muster under the Commerce Clause and the Necessary and Proper Clause, and, independently, the General Welfare Clause of the Constitution.

> A.    **The comprehensive regulatory measures of the ACA, including the minimum coverage provision, are a proper exercise of Congress's Article I powers under the Commerce Clause and the Necessary and Proper Clause**
>
> > 1.    **Congress's Commerce Clause authority is broad and the Court's review is deferential**

The Constitution grants Congress the power to "regulate Commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3, and to "make all Laws which shall be necessary and proper" to the execution of that power, *id*. cl. 18.  This grant of authority is broad.  Congress may "regulate the channels of interstate commerce;" it may "regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce;" and it may "regulate activities that substantially affect interstate commerce."  *Raich*, 545 U.S. at 16-17.  The question is not whether any one person's conduct, considered in isolation, substantially affects interstate commerce, but whether there is a rational basis for concluding that the class of activities, "taken in the aggregate," does so.  *Id.* at 22; *see Wickard v. Filburn*, 317 U.S. 111, 127-28 (1942).  In other words, "[w]here the class of activities is regulated and that class is within the reach of

federal power, the courts have no power to excise, as trivial, individual instances of the class." *Raich*, 545 U.S. at 23 (quotation omitted).

In exercising its Commerce Clause power, Congress may reach even wholly intrastate, non-commercial matters when it concludes that the failure to do so would undercut the operation of a larger program regulating interstate commerce. *Id.* at 18; *accord United States v. Kukafka*, 478 F.3d 531, 536 (3d Cir. 2007); *see also United States v. Malloy*, 568 F.3d 166, 180 (4th Cir. 2009), *cert denied*, 130 S. Ct. 1736 (2010) (applying *Raich* to uphold a ban on child pornography produced for personal use). Thus, when "a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *Raich*, 545 U.S. at 17 (citation and internal quotation omitted).

In assessing Congressional judgments on these issues, the Court's task "is a modest one." *Raich*, 545 U.S. at 22. The Court need not itself measure the impact on interstate commerce of the activities Congress sought to regulate. Nor need the Court calculate how integral a particular provision is to a larger regulatory program. The Court's task instead is to determine "whether a 'rational basis' exists" for Congress's conclusions. *Id.* Under rational basis review, this Court may not second-guess the factual record upon which Congress relied.[7]

*Raich* and *Wickard* illustrate the breadth of the Commerce power and the deference accorded Congress's judgments. In *Raich*, the Court sustained Congress's authority to prohibit the possession of home-grown marijuana intended solely for personal use. It was sufficient that the Controlled Substances Act "regulates the production, distribution, and consumption of

---

[7] This Court accordingly may and should consider that record in its review of this motion to dismiss. *See* Fed. R. Evid. 201 advisory committee's note.

24

commodities for which there is an established, and lucrative, interstate market." *Raich*, 545 U.S. at 26. Similarly, in *Wickard*, the Court upheld a penalty on wheat grown for home consumption despite the farmer's protests that he did not intend to put the commodity on the market. It was sufficient that the existence of home-grown wheat, in the aggregate, could "suppl[y] a need of the man who grew it which would otherwise be reflected by purchases in the open market," thus undermining the efficacy of the federal price stabilization scheme. *Wickard*, 317 U.S. at 128. In each case, the Court upheld obligations even on individuals who claimed not to participate in interstate commerce because those obligations were components of broad schemes regulating interstate commerce.

*Raich* came after the Court's decisions in *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), and thus highlights the central focus and limited scope of those decisions. Unlike *Raich* and this case, neither *Lopez* nor *Morrison* involved a regulation of economic activity or addressed a measure that was integral to a comprehensive scheme to regulate activities in interstate commerce. *Raich*, 545 U.S. at 23-26.

> ### 2. The ACA, and the minimum coverage provision, regulate the interstate market in health insurance and health care services

Regulating a $2.5 trillion interstate market that consumes more than an estimated 17.5% of the annual gross domestic product is well within the compass of congressional authority under the Commerce Clause. Pub. L. No. 111-148, §§ 1501(a)(2)(B), 10106(a). It has long been established that Congress has power to regulate insurance, *see United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 553 (1944), as well as health care services, *see Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 743-44 (1976). Congress has repeatedly exercised its

power over this field, providing directly for government-funded health insurance through the Medicare Act and, over a period of more than 35 years, enacting numerous statutes that regulate the content of policies offered by private employers and insurers.[8]   And plaintiffs here undoubtedly participate in the market for health care services, whether they want to or not.  At some point, nearly everyone will procure health care-related goods and services to deal with health problems.  Plaintiffs do not contend that they are the exception to this truth.[9]

> **3.     The minimum coverage provision is an integral part of the larger regulatory scheme and is necessary and proper to Congress's regulation of interstate commerce**

---

[8]  In 1974, Congress enacted the Employee Retirement and Income Security Act, Pub L. No. 93-406, 88 Stat. 829 ("ERISA"), establishing federal requirements for health insurance plans offered by private employers.  Congress passed the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, 100 Stat. 82 ("COBRA"), allowing workers who lose their health benefits under certain circumstances the right to continue receiving certain benefits from their plans for a time.  In 1996, Congress enacted the Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 ("HIPAA"), to improve access to health insurance by, among other things, generally prohibiting group plans from discriminating against individual participants based on health status, requiring insurers to offer coverage to small businesses, and limiting the pre-existing condition exclusion period for group plans.  26 U.S.C. §§ 9801-03; 29 U.S.C. §§ 1181(a), 1182; 42 U.S.C. §§ 300gg, 300gg-1.  *See also* Mental Health Parity Act of 1996, Pub. L. No. 104-204, 110 Stat. 2944 (regulating limits on mental health benefits); Newborns' and Mothers' Health Protection Act of 1996, Pub. L. No. 104-204, 110 Stat. 2935 (requiring plans that offer maternity coverage to provide at least a 48-hour hospital stay following childbirth); Women's Health and Cancer Rights Act of 1998, Pub. L. No. 105-277, § 902, 112 Stat. 2681, 2681-436 (requiring certain plans to offer benefits related to mastectomies). More recently, Congress passed the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, Pub. L. No. 110-343, § 512, 122 Stat. 3765, 3881, requiring parity in financial requirements and treatment limitations between mental health and substance abuse disorder benefits and medical and surgical benefits.

[9]  Plaintiffs do not disavow any need for health care services, nor do they object to health insurance generally.  Even if they did object, Congress need not exempt them from the larger regulatory scheme.  "Where the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class." *Raich*, 545 U.S. at 23 (quotation omitted).

The ACA's reforms of the interstate insurance market—particularly its requirement that insurers guarantee coverage for all individuals, even those with pre-existing medical conditions—could not function effectively without the minimum coverage provision. Pub. L. No. 111-148, §§ 1501(a)(2)(H), (I), 10106(a). The provision is thus an essential part of a larger regulation of interstate commerce, and thus, under *Raich*, is well within Congress's Commerce Clause authority. *Raich*, 545 U.S. at 18. Analyzing the minimum coverage provision under the Necessary and Proper Clause leads to the same conclusion for fundamentally the same reason: The provision is a reasonable means to accomplish Congress's goal of ensuring all Americans access to affordable coverage.

The minimum coverage provision is an "essential" part of the Act's larger regulatory scheme for the interstate health care market. The Act adopts a series of measures to increase the availability and affordability of health insurance, including, in particular, measures to prohibit an array of insurance industry practices that have denied or terminated coverage, or increased premiums, for those with the greatest health care needs. Notably, medical underwriting yields substantially higher risk-adjusted premiums or outright denial of insurance coverage for an estimated one fifth of applicants. *See* CBO, Key Issues, at 81. Beginning in 2014, the Act will bar insurers from refusing to cover or charging more to individuals with pre-existing medical conditions and will end discrimination against individuals with pre-existing medical conditions by prohibiting eligibility rules based on health status-related factors, including medical condition, claims experience, and medical history. Pub. L. No. 111-148, § 1201. These provisions, which directly regulate the content of insurance policies sold nationwide, are clearly

within the Commerce Clause power.  *See, e.g.*, *South-Eastern Underwriters Ass'n*, 322 U.S. at 553.[10]

Congress found that, without the minimum coverage provision, these insurance reforms would encourage more individuals to forgo insurance or drop existing coverage until they needed substantial care—at which point the ACA would obligate insurers to cover them at the same cost as everyone else.  The market distortion would make insurance *less* affordable for everyone, *decrease* the number of insured individuals, and create pressures that would "inexorably drive [the health insurance] market into extinction," precisely contrary to Congress's intent.  *Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm. on Ways & Means*, 111th Cong. 13 (2009) (statement of Uwe Reinhardt, Ph.D., Professor, Princeton Univ.) [hereinafter *Health Reform in the 21st Century*].[11]  Accordingly, Congress found the minimum coverage provision to be "essential" to its broader effort to regulate underwriting practices that prevented many from obtaining health insurance, Pub. L. No. 111-148, §§ 1501(a)(2)(H), (I), 10106(a).

---

[10]  The McCarran Ferguson Act, 15 U.S.C. §§ 1011-1015, does not change this conclusion.  That Act exempts the business of insurance from federal regulation except when a federal law "specifically relates to the business of insurance."  15 U.S.C. § 1012(b).  It is beyond question that the ACA, which comprehensively reforms the business of health insurance, "specifically relates to the business of insurance."  *Id.*

[11]  *See also Health Reform in the 21st Century* at 101-02 (statement of Dr. Reinhardt); *id*. at 123-24 (submission of National Association of Health Underwriters) (observing, based on the experience of "states that already require guaranteed issue of individual policies, but do not require universal coverage," that, "[w]ithout near universal participation, a guaranteed-issue requirement . . . would have the perverse effect of encouraging individuals to forego buying coverage until they are sick or require sudden and significant medical care").

In other respects as well, the minimum coverage provision is essential to the Act's comprehensive regulatory scheme to ensure that health insurance is available and affordable. The provision works in tandem with the Act's reforms to reduce the upward pressure on premiums caused by the practice of medical underwriting. This process of individualized review of an applicant's health status contributes to administrative fees that are responsible for 26 to 30 percent of the cost of premiums in the individual and small group markets. Pub. L. No. 111-148, §§ 1501(a)(2)(J), 10106(a). The minimum coverage requirement helps to counteract these pressures by significantly increasing health insurance coverage and the size of purchasing pools, and thereby increasing economies of scale. *Id.* §§ 1501(a)(2)(J), 10106(a).

Because the minimum coverage provision is essential to Congress's overall regulatory reform of the interstate health care and health insurance markets, it is also a valid exercise of Congress's authority under the Necessary and Proper Clause. U.S. Const. art. I, § 8, cl. 18. "[T]he Necessary and Proper Clause grants Congress broad authority to enact federal legislation." *United States v. Comstock*, 130 S. Ct. 1949, 1956 (2010). It has been settled since *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), that this Clause affords Congress the power to employ any means "reasonably adapted to the end permitted by the Constitution." *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276 (1981) (internal quotation omitted). And when Congress legislates in furtherance of a legitimate end, its choice of means is accorded broad deference. *See Sabri v. United States*, 541 U.S. 600, 605 (2004); *see also Comstock*, 130 S. Ct. at 1956-57. "[W]here Congress has the authority to enact a regulation of interstate commerce, 'it possesses every power needed to make that regulation effective.'"

*Raich*, 545 U.S. at 36 (Scalia, J., concurring in the judgment) (quoting *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 118-19 (1942)).   As demonstrated above, Congress reasonably found that the minimum coverage provision not only is adapted to, but is "essential" to, achieving key reforms of the interstate health care and health insurance markets.

### 4.   The minimum coverage provision regulates conduct with substantial effects on interstate commerce

The minimum coverage provision is a valid exercise of Congress's powers for a second reason.   Congress needed no extended chain of inferences to determine that decisions about how and when to pay for health care—particularly whether to obtain health insurance or to attempt to pay for health care out of pocket—in the aggregate substantially affect the interstate health care market.   Indeed, Congress expressly recognized that "decisions about how and when health care is paid for, and when health insurance is purchased" are "economic and financial" and therefore "commercial and economic in nature." Pub. L. No. 111-148, §§ 1501(a)(2)(A), 10106(a).[12]

Individuals who forgo health insurance coverage do not thereby forgo health care.   To the contrary, many of the uninsured will "receive treatments from traditional providers for which they either do not pay or pay very little, which is known as 'uncompensated care.'" CBO, Key Issues, at 13; *see also* Council of Economic Advisers ("CEA"), The Economic Case for Health Care Reform 8 (June 2009).   This country effectively guarantees a minimum level of health care.   The Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd, for example, requires hospitals that participate in Medicare and offer emergency services to screen and stabilize any

---

[12]   Although Congress is not required to set forth particularized findings of an activity's effect on interstate commerce, when it does so, courts "will consider congressional findings in [their] analysis." *Raich*, 545 U.S. at 21.

patient who presents with an emergent condition, regardless of whether he has insurance or otherwise can pay for that care. CBO, Key Issues, at 13. In addition, most hospitals "have some obligation to provide care for free or for a minimal charge to members of their community who could not afford it otherwise." *Id.*

Uncompensated care, however, is not free. In the aggregate, it cost $43 billion in 2008, or about 5 percent of overall hospital revenues. *See* Pub. L. No. 111-148, §§ 1501(a)(2)(F), 10106(a); CBO, Key Issues, at 114. Public funds subsidize these costs. Through vehicles such as Disproportionate Share Hospital payments, the federal government paid for tens of billions of dollars in uncompensated care for the uninsured in 2008 alone. H.R. Rep. No. 111-443, pt. II, at 983 (2010); CEA, The Economic Case, at 8. The remaining costs are borne in the first instance by health care providers, which "pass on the cost to private insurers, which pass on the cost to families." Pub. L. No. 111-148, § 1501(a)(2)(F), 10106(a). This cost-shifting creates a "hidden tax" reflected in fees charged by health care providers and premiums charged by insurers. CEA, Economic Report of the President 187 (Feb. 2010); *see also* H.R. Rep. No. 111-443, pt. II, at 985 (2010); S. Rep. No. 111-89, at 2 (2009).

As premiums increase, more people decide not to buy coverage. This self-selection further narrows the risk pool, forcing upward the price of coverage even more for those who are insured. The result is a self-reinforcing "premium spiral." *Health Reform in the 21st Century*, at 118-19 (statement of the American Academy of Actuaries); *see also* H.R. Rep. No. 111-443, pt. II, at 985 (2010). This premium spiral particularly harms small employers, due to their relative lack of bargaining power. *See* H.R. Rep. No. 111-443, pt. II, at 986-88 (2010); *see also 47*

*Million and Counting: Why the Health Care Market Is Broken: Hearing Before the S. Comm. on Finance*, 110th Cong. 36 (2008) (statement of Raymond Arth, President & CEO, Phoenix Prods., Inc.).

The putative right to forgo health insurance that plaintiffs champion includes decisions by some to engage in market timing. These individuals will purchase insurance in later years, but choose in the short term to incur out-of-pocket costs with the backup of the emergency room services that Medicare-participating hospitals with emergency departments must provide whether or not the patient can pay. *See* CBO, Key Issues at 12. By making the economic calculation to opt out of the health insurance pool during these years, these individuals skew premiums upward for the insured population. Yet when they later need care, many of these uninsured will opt back into the health insurance system, maintained in the interim by that same insured population. In the aggregate, these economic decisions by the uninsured have a substantial effect on the interstate health care market. Congress may use its Commerce Clause authority to regulate these direct and aggregate effects. *See Raich*, 545 U.S. at 16-17; *Wickard*, 317 U.S. at 127-28.

Plaintiffs cannot brush aside these marketplace realities by claiming that an individual who decides to go without insurance coverage is engaged in "inactivity" and therefore beyond the reach of the Commerce Clause. Second Am. Compl. ¶ 52. First, people who need to procure services to meet their health care needs—virtually all of us—are already active participants in the health care marketplace, and it is not the federal government that puts them there. Second, the "inactivity" assertion misunderstands both the nature of the regulated activity and the scope of Congress's power. People who make the "economic and financial" choice to

try to pay for health care services without insurance, Pub. L. No. 111-148, §§ 1501(a)(2)(A), 10106(a), are not passive bystanders divorced from the health care market. They have chosen a method of payment for the services they will receive, no more "passive" than a decision to pay by credit card rather than by check. Congress specifically focused on those who have such an economic choice, exempting certain individuals who cannot purchase health insurance for religious reasons, as well as those who cannot afford insurance, or who would suffer hardship if required to purchase it. *See* 26 U.S.C. § 5000A(d)(2), (e)(1) and (5). Indeed, plaintiffs Waddell and Merrill portray their own choices to forgo health insurance as "private economic decisions" and "elect[ions] not to engage in commerce." Second Am. Compl. ¶ 52. Individuals who take that economic gamble, not knowing (as they cannot know) what health care costs they may later incur, have made an active economic choice that Congress found substantially affects the interstate markets in health insurance and health care services.

The ACA in fact regulates economic activity far more directly than provisions the Supreme Court has previously upheld. In *Wickard*, the Court upheld a system of production quotas, despite the claim that the statute "forc[ed] some farmers into the market to buy what they could provide for themselves." 317 U.S. at 129. The Court reasoned that "[h]ome-grown wheat . . . competes with wheat in commerce. The stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions thereon." 317 U.S. at 128. *See also Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258-59 (1964) (Commerce Clause reaches decisions not to engage in transactions with persons with whom plaintiff did not wish to deal); *Daniel v. Paul*, 395 U.S. 298 (1969) (same). And in *Raich*, the Court likewise rejected

33

plaintiffs' claim that their home-grown marijuana was "entirely separated from the market" and thus not subject to regulation under the Commerce Clause. 545 U.S. at 30. Similarly, the ACA regulates a class of individuals who almost certainly will participate in the health care market, who have decided to finance that participation—or not—in one particular way, and whose decisions impose substantial costs on other participants in that market. These "private economic decisions," Second Am. Compl. ¶ 52, regarding how to pay for medical services that will inevitably be necessary substantially affect the larger market for health care services. That empowers Congress to regulate.

### B. The minimum coverage provision is a valid exercise of Congress's independent power under the General Welfare Clause

Plaintiffs' challenge fails on the merits for an additional reason. Independent of its Commerce Clause authority, Congress is vested with the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States[.]" U.S. Const. art. I, § 8, cl. 1. Subject to nominal constraints concerning the allocation of particular types of taxes, Congress's General Welfare Clause power has long been recognized as "extensive." *License Tax Cases*, 72 U.S. (5 Wall.) 462, 471 (1867); *see also Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 581 (1937). Congress may use its power under this Clause even for purposes that would exceed its powers under the other provisions of Article I. *See United States v. Sanchez*, 340 U.S. 42, 44 (1950) ("Nor does a tax statute necessarily fall because it touches on activities which Congress might not otherwise regulate.").

To be sure, Congress must use this power under Article I, Section 8, Clause 1 to "provide for the . . . general Welfare."  But, as the Supreme Court held 75 years ago with regard to the Social Security Act, such decisions of how best to provide for the general welfare are for the representative branches, not for the courts.  *Helvering v. Davis*, 301 U.S. 619, 640, 645 & n.10 (1937); *see also South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

The minimum coverage provision falls within Congress's "extensive" General Welfare authority.  *License Tax Cases*, 72 U.S. at 471.  The Act requires individuals not otherwise exempt to obtain "minimum essential coverage" or to pay a penalty.  Pub. L. No. 111-148, § 1501(b) (adding 26 U.S.C. § 5000A(a), (b)(1)).  Congress placed the provision in the Internal Revenue Code, as part of a subtitle labeled "Miscellaneous Excise Taxes."  In general, the penalty is calculated as the greater of a fixed amount or a percentage of the individual's household income, but may not exceed the national average premium for the lowest-tier plans offered through health insurance Exchanges for the individual's family size.  *Id*. § 1501(b) (adding 26 U.S.C. § 5000A(c)(1), (2)).  If the penalty applies, the individual must report it on his return for the taxable year, as an addition to his income tax liability.[13]  *Id*.  (adding 26 U.S.C. § 5000A(b)(2)).  The penalty is assessed and collected in the same manner as other penalties imposed by the Internal Revenue Code.[14]  26 U.S.C. § 5000A(g)(1).

---

[13]  Individuals who are not required to file income tax returns for a given year are not subject to the provision.  Pub. L. No. 111-148, § 1501(b) (as amended by Pub. L. No. 111-152, § 1002) (adding 26 U.S.C. § 5000A(e)(2)).

[14]  The Secretary of the Treasury may not collect the penalty by means of notices of liens or levies or bring a criminal prosecution or impose a criminal penalty for a failure to pay the penalty.  Pub. L. No. 111-148, § 1501(b) (adding 26 U.S.C. § 5000A(g)(2)).  The revenues derived from the minimum coverage penalty are paid into general revenues.

35

That the provision has a regulatory purpose does not place it beyond Congress's General Welfare Clause power.[15]  *Sanchez*, 340 U.S. at 44 ("It is beyond serious question that a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed"); *cf. Bob Jones Univ.*, 416 U.S. at 741 n.12 (noting that the Court has "abandoned" older "distinctions between regulatory and revenue-raising taxes").[16]  To hold otherwise would suggest that, among numerous other provisions, the "excise tax on high cost employer-sponsored health coverage," Pub. L. No. 111-148, § 9001, and the tax credit to encourage small businesses to offer their employees coverage, *id*. § 1421, are likewise not exercises of the General Welfare power, because they, too, are designed to affect behavior regarding insurance coverage.  So long as a statute is "productive of some revenue," the courts will not second-guess Congress's exercise of its General Welfare Clause power, and "will not undertake, by collateral inquiry as to the measure of the regulatory effect of a tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution." *Sonzinsky v. United States*, 300 U.S. 506, 514 (1937).

---

[15]  Congress has long used the General Welfare Clause power as a regulatory tool, and in particular as a tool to regulate how health care is paid for in the national market.  HIPAA, for example, limits the ability of group health plans to exclude or terminate applicants with pre-existing conditions, and imposes a tax on any plan that fails to comply with these requirements. 26 U.S.C. §§ 4980D, 9801-03.  In addition, the Internal Revenue Code requires group health plans to offer COBRA continuing coverage to terminated employees, and similarly imposes a tax on any plan that fails to comply with this mandate.  26 U.S.C. § 4980B.

[16]  Nor does the statutory label of the minimum coverage provision as a "penalty" matter.  "In passing on the constitutionality of a tax law [the Court is] concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it." *Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 363 (1941) (citation and internal quotation omitted).

The minimum coverage provision easily meets this standard. The CBO estimated that the provision would produce about $4 billion in annual revenue once it is fully in effect. CBO Letter at tbl. 4 at 2. Thus, the minimum coverage provision produces some revenue alongside its regulatory purpose, which is all that Article I, Section 8, Clause 1 requires.

Additionally, Congress acted well within its prerogatives under the Necessary and Proper Clause to include the minimum coverage provision as an integral component of the revenue and spending provisions in the ACA. To expand insurance coverage, Congress, among other things, enacted tax credits for eligible individuals, families, and small businesses to help purchase health insurance coverage through the new Exchanges; penalties on certain large employers that do not offer adequate insurance and have a full-time employee receiving a premium tax credit in an Exchange; and cost-sharing reductions for eligible individuals and families. Congress also authorized significant federal expenditures to cover the costs of expanding Medicaid eligibility, and made tax assessments on pharmaceutical and medical device manufacturers, as well as insurance companies, to help finance the additional coverage. Congress reasonably determined that the minimum coverage provision is essential to the success of these other, interrelated revenue and spending provisions, and thus, is necessary and proper to the overall goal of advancing the general welfare. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 90 (1976) (grant of power under the General Welfare Clause "is quite expansive, particularly in view of the enlargement of power by the Necessary and Proper Clause").

**C.     The employer responsibility provision is also a valid exercise of Congress's Commerce Clause and General Welfare Clause authorities**

37

Plaintiffs also assert that the employer responsibility requirement—which, beginning in 2014, will require applicable large employers to offer adequate health insurance to their employees or pay a penalty if a full-time employee receives a tax credit in an Exchange—exceeds Congress's authority under the Commerce Clause. This claim is spurious. A law that regulates the terms of employment, including the terms by which an employer sponsors health insurance for its employees, on its face regulates interstate economic matters. For that reason, it has been settled for decades that such regulation is within Congress's Commerce Clause authority. *See United States v. Darby*, 312 U.S. 100 (1941) (upholding the Fair Labor Standards Act, which requires certain employers to pay their employees a minimum wage, pay overtime wages, and comply with standards for child labor).[17]

Indeed, the record before Congress here showed that interstate commerce is inhibited, and economic progress stymied, when workers decline to take better jobs because they must give up their current health plan and may be unable to obtain a comparable one. *See* Key Issues at 8, 164-65. By creating incentives for large employers to provide a minimum level of coverage, the Act addresses this "job lock" concern and facilitates interstate commerce.

The employer responsibility requirement is also independently justified as a necessary and proper component of the larger regulatory scheme. Without it, the ACA's new regulations

---

[17] *See also Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 537 (1985) (upholding Congress's authority to enforce the FLSA's minimum wage and overtime standards against both private and public employers); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33–43 (1937) (upholding the National Labor Relations Act of 1935, which prohibits unfair labor practices and employer restrictions or interference with union membership); *EEOC v. Wyoming*, 460 U.S. 226, 248 (1983) (Stevens, J., concurring) ("Today, there should be universal agreement on the proposition that Congress has ample power to regulate the terms and conditions of employment."), *superseded by statute and implicitly overruled on other grounds by Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 79 (2000).

would encourage employers to drop existing insurance policies, which would exacerbate financial burdens on both the individuals who would lose coverage and on the federal government. In fact, Congress passed the employer responsibility provision in part because it anticipated a windfall to employers that stop offering health insurance in light of the ACA's provisions making individually-obtained health insurance more affordable.

Finally, the employer responsibility provision is also constitutional as an exercise of Congress's General Welfare Clause authority, as the assessment for failing to provide adequate coverage to full-time employees if a full-time employee receives a premium tax credit in an Exchange will be "productive of some revenue." *Sonzinsky*, 300 U.S. at 514.

### D.    The minimum coverage provision and the employer responsibility provision do not offend the Tenth Amendment

In Count II, plaintiffs assert that the employer responsibility provision and the minimum coverage provision violate the Tenth Amendment. Second Am. Compl. ¶¶ 108-19. But as the Supreme Court has explained, "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States*, 505 U.S. 144, 156 (1992); *see also United States v. Johnson*, 114 F.3d 476, 480 (4th Cir. 1997) (identifying the "obvious fact that an exercise of a constitutionally-enumerated power cannot involve a 'power[] not delegated to the United States,' hence is not within a realm of power reserved by the Tenth Amendment to the states"). As explained earlier, the employer responsibility requirement and the minimum coverage provision are well within Congress's authorities under the Commerce Clause and the General Welfare Clause.

### E.    The ACA does not violate the Republican Form of Government Clause

39

Article IV, § 4 of the Constitution provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government."  Plaintiffs assert that the ACA violates this clause.  *See* Second Am. Compl. ¶¶ 177-83.  But plaintiffs lack standing to raise a Guarantee Clause claim.  *See* Laurence H. Tribe, American Constitutional Law 398 (2d ed. 1988) (recognizing "the unavailability of the guaranty clause as a textual source of protection for individuals").

In any event, plaintiffs' challenge is plainly meritless.  As is evident from the text of the clause, "[i]f there is any role for federal courts under the Clause, it is restricted to real threats to a republican form of government."  *Largess v. Supreme Judicial Court for State of Mass.*, 373 F.3d 219, 227 (1st Cir. 2004).  By guaranteeing only the basic fundamentals of republican governance, the clause is accordingly applicable only "in highly limited circumstances," such as "abolish[ing] the legislature" or "establishment of a monarchy," *id.* at 228-29, or matters infringing upon states' determination of "the qualifications of their most important government officials," *Gregory v. Ashcroft*, 501 U.S. 452, 463 (1991).

Nothing of that sort has occurred here.  Plaintiffs merely repeat their claims that the ACA exceeds Congress's constitutional authority, violates the Tenth Amendment, and infringes upon the constitutional rights of individuals.  Second Am. Compl. ¶¶ 178-81.  As explained above, those claims are without merit, and in any event do not implicate the Guarantee Clause.  *See Kelley v. United States*, 69 F.3d 1503, 1511 (10th Cir. 1995) ("[H]aving concluded that § 601 does not violate the Commerce Clause or the Tenth Amendment, it is difficult to understand how

40

§ 601 could be construed in any way as affecting the states' ability to structure their own governments as they see fit."). This claim should accordingly be rejected.

## IV.    PLAINTIFFS' FIRST AMENDMENT CLAIMS ARE MERITLESS

In Counts III, IV, and VII, plaintiffs assert that the ACA violates nearly every clause of the First Amendment. This haphazard approach cannot obscure plaintiffs' lack of standing to assert any of these claims, which all trace to the minimum coverage provision and the employer responsibility provision. These claims also fail the test of logic. They are based on plaintiffs' opposition to abortion and their refusal to take part in funding abortion services. But plaintiffs, in 2014, may well be able simply to choose to purchase an insurance plan that does not cover abortion services. Federal tax revenues, to which plaintiffs have presumably contributed, for decades have financed programs that cover abortions in cases of rape or incest, or where the life of the woman would be endangered ("excepted abortions").[18] Nonetheless, it is possible that plaintiffs will be able to purchase a plan that does not provide abortion coverage at all. The ACA expressly allows plans in the Exchanges to decide not to cover any abortion services, including excepted abortion services, Pub. L. No. 111-148, § 1303(b)(1), and affirms the states' prerogative to prohibit such plans from covering any abortion services, *id.* § 1303(a)(1). As for other, non-excepted abortion services, it is certain that plaintiffs will be able to purchase a plan that does not cover them. The ACA specifically requires that at least one multi-state plan in each Exchange not cover non-excepted abortion services. *Id.* § 1334(a)(6). It is therefore at best premature for this Court to address the merits of plaintiffs' claims.

---

[18]   The Hyde Amendment, first enacted 34 years ago, currently prohibits the use of HHS's appropriated funds to pay for non-excepted abortion services but permits the use of such funds to pay for excepted abortion services.

**A.     The minimum coverage provision and the employer responsibility provision do not violate the Free Exercise Clause or the Religious Freedom Restoration Act**

Plaintiffs insist that the ACA's provisions concerning abortions and Exchanges violate the Free Exercise Clause by allegedly forcing plaintiffs to contribute to abortion services funding. Second Am. Compl. ¶ 131-49. When the minimum coverage provision takes effect in 2014, plaintiffs argue, they will be forced to purchase health insurance policies that cover abortion services, and their premium payments will be co-mingled with funds used to pay for abortion services. In 2014, however, plaintiffs may purchase insurance from a plan that that does not provide non-excepted abortion coverage; indeed, plaintiffs may very well be able to purchase insurance from a plan that does not provide abortion coverage at all. And aside from the fact that plaintiffs cannot show that they will be forced to buy insurance policies that cover abortion services in 2014, it is well-settled that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Emp't Div. v. Smith*, 494 U.S. 872, 879 (1990) (internal citation and quotation omitted).

Plaintiffs' claim under the Religious Freedom Restoration Act ("RFRA"), which mirrors their Free Exercise claim, is equally unpersuasive. Congress enacted RFRA, Pub. L. No. 103-141, 107 Stat. 1488 (codified at 42 U.S.C. § 2000bb-1 *et seq.*) in response to *Smith*. RFRA was intended to reinstate the pre-*Smith* "compelling interest" test for evaluating legislation that substantially burdens the free exercise of religion. 42 U.S.C. § 2000bb-1(b). Under RFRA, the government generally may not "substantially burden a person's exercise of religion, 'even if the

burden results from a rule of general applicability.'"  *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb-1(a)).  However, the government may substantially burden the exercise of religion if it "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(b).

Far from a substantial burden of religious exercise, plaintiffs cannot show a burden at all. Plaintiffs, in 2014, will be able to purchase insurance from a plan that does not provide non-excepted abortion coverage, *see* Pub. L. No. 111-148, § 1334(a)(6), and may very well be able to purchase insurance from a plan that does not provide any abortion coverage, *see id.* § 1303(a)(1), (b)(1)(A)(i).  In any event, merely doing business with an insurance company that provides abortion coverage to others does not "force [plaintiffs] to 'choose between following the precepts of [their] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of [their] religion . . . on the other hand."  *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)).  Plaintiffs are not required to interact with or contribute to abortion providers; any burden on religious exercise, therefore, is not direct or substantial.  *See Braunfeld v. Brown*, 366 U.S. 599, 606 (1961) ("To strike down, without the most careful scrutiny, legislation which imposes only an indirect burden on the exercise of religion, i.e., legislation which does not make unlawful the religious practice itself, would radically restrict the operating latitude of the legislature.").  And even if, contrary to reality, plaintiffs were able to demonstrate a substantial burden on their religious exercise, they

would not prevail because the minimum coverage provision is justified by a compelling government interest and is the least restrictive means to achieve that interest.[19]

**B.    The minimum coverage provision and the employer responsibility provision do not violate plaintiffs' free association or free speech rights**

Plaintiffs also insist that the minimum coverage and employer responsibility provisions violate the First Amendment's guarantee of free association by requiring plaintiffs to associate themselves with insurance companies that, they contend, will necessarily cover abortion services. Second Am. Compl. ¶ 165-71. They also complain that the "fines, fees, and taxes on individuals and employers" will be used "to subsidize insurance programs that fund abortion" in violation of plaintiffs' free speech rights. *Id.* ¶ 169. Plaintiffs are wrong on both counts. As explained earlier, plaintiffs cannot show that they will be compelled in 2014 to associate with insurers that provide abortion coverage; plaintiffs may very well be able to choose not to purchase insurance from a plan that provides abortion coverage.[20]

By statute, it is impossible for plaintiffs to be required to buy insurance from a plan on an Exchange that covers non-excepted abortion services. Pub. L. No. 111-148, § 1334(a)(6). Moreover, by statute, states may prohibit coverage of any abortion services by plans in the Exchanges, and such plans may not be required to cover any abortion services. *Id.* § 1303(a)(1), (b)(1)(A)(i). It is therefore possible that plaintiffs will be able to purchase insurance from plans

---

[19]    Without question, the minimum coverage provision's objective—promoting the public health—is a compelling government interest. *See, e.g., Bill Johnson's Rests. v. NLRB*, 461 U.S. 731, 742 (1983). And as Congress found, the health insurance system is "national" and "near-universal coverage" is "essential" to the implementation of the ACA's broader insurance reforms and its purpose of making health care coverage more available and affordable. ACA § 1501(a)(2).

[20]    Notably, plaintiffs do not claim that they object to health insurance generally.

44

that do not provide abortion coverage at all.  Regardless, there is no violation of plaintiffs' right of free association.  The First Amendment protects the right to speak, to petition the government, and to worship.  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).  The right of expressive association is the "correlative freedom to engage in group effort towards those ends."  *Id.*  But contrary to plaintiffs' apparent premise, the First Amendment's protection of association does not contain a blanket freedom not to associate.  Rather, a group or an individual has a right to avoid association only if compelled association "may impair the ability" of the group or individual to express a message.  *Roberts*, 468 U.S. at 623.  If that ability to express a message, by the individual or the group, is not impaired by a regulation, the freedom of expressive association is not implicated at all.  *See Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 69-70 (2006) [hereinafter *FAIR*].

The purchase of insurance is therefore not the type of association protected by the First Amendment.  At the most, the employer responsibility provision and the minimum coverage provision require "mere association"—in this case, the purchase of a product—which the Supreme Court has held does not impair the right to expressive association.  *Id.* at 69.  Like the law in *FAIR*, the ACA does not prevent Liberty or the individual plaintiffs from expressing their views about anything, does not require them to endorse a view with which they disagree, or invite insurers into their homes.  As in *FAIR*, plaintiffs remain "free to associate to voice their disapproval" of abortion, *id.* at 69-70, and the ACA does nothing to undermine or dilute this message.  Indeed, if plaintiffs' theory that individuals have a right to "not associate with those with whom they do not agree" were correct, Second Am. Compl. ¶ 168, state requirements that

45

drivers carry automobile insurance would presumably unconstitutionally abridge the freedom to associate, as would federal and state laws that require school attendance or service on a jury—all of which implicate "mere association," not expressive association.

Nor can Liberty or the individual plaintiffs prevail on their free speech claim. Plaintiffs apparently reason that the "fines, fees and taxes" levied by the ACA will be used to provide premium tax credits or cost-sharing reductions in the Exchanges, which will then somehow find their way to abortion services when an eligible individual purchases an insurance plan that covers such services. Thus, plaintiffs insist that the ACA compels them to express a message with which they disagree. This claim is meritless.

First, contrary to plaintiffs' claims, the ACA on its face does not use federal funds— irrespective of whether they are generated by "fines," "fees," or "taxes" resulting from the ACA itself—to pay for non-excepted abortion services. This policy is stated in the statute and in an Executive Order. *See* Pub. L. No. 111-148, § 1303; March 24, 2010 Executive Order ("Patient Protection and Affordable Care Act's Consistency with Longstanding Restrictions on the Use of Federal Funds for Abortion"). The ACA thus contains strict safeguards at multiple levels designed to prevent federal funds from being used to pay for abortion services beyond those in cases of rape or incest, or where the life of the woman would be endangered. Where plans that provide non-excepted abortion coverage are at issue, a separate payment for non-excepted abortion services must be made, § 1303(b)(2)(B)(i)(II), and insurers must deposit such payments in a separate allocation account, and use only the amounts in that account to pay for non-excepted abortion services. *Id.* § 1303(b)(2)(C)(ii)(II). Insurers are prohibited by law from

46

using funds attributable to premium tax credits, *id.* § 1303(b)(2)(A)(i), or cost-sharing reductions in out-of-pocket maximum limits for individuals with income below 400 percent of the federal poverty level, *id.* § 1303(b)(2)(A)(ii), to pay for non-excepted abortion services. Numerous federal and state agencies have a role in ensuring that these restrictions are vigorously enforced.

Second, even if tax revenues were used for non-excepted abortion services—contrary to the statute and the Executive Order—the government's use of taxes—even for expressive purposes—does not violate the First Amendment. "'Compelled support of government'—even those programs of government one does not approve—is of course perfectly constitutional, as every taxpayer must attest. And some government programs involve, or entirely consist of, advocating a position." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 559 (2005). As the Court has explained, "[t]he government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000). Indeed, "if every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it would be radically transformed." *Keller v. State Bar of California*, 496 U.S. 1, 12-13 (1990); *see also Tarsney v. O'Keefe*, 225 F.3d 929, 936 (8th Cir. 2000) (finding that plaintiffs lacked standing to challenge the Hyde Amendment and explaining "when the government appropriates public funds, it is not doing anything the Constitution prohibits unless the expenditure directly prevents an individual from exercising religious beliefs"

47

by, for example, "us[ing] public funds to prevent members of a religious group from voicing their opposition to abortion").

Plaintiffs' free association and free speech claims thus should be rejected.

### C.     The religious exemptions to the minimum coverage provision are consistent with the Establishment Clause

The Establishment Clause of the First Amendment provides: "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The ACA's religious exemptions do not violate this Clause. The Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144-45 (1987). Indeed, "there is room for play in the joints between" the Free Exercise and Establishment Clauses, such that government can accommodate religion beyond what the Free Exercise Clause mandates, without violating the Establishment Clause. *Locke v. Davey*, 124 S. Ct. 1307, 1311 (2004) (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 669 (1970)).

In *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005), the Supreme Court clarified the scope of this "corridor between the Religion Clauses" in the context of a legislative accommodation of religious practice. There, the Court considered a provision of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") that generally forbids the government from "'impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution,' unless the burden 'furthers a compelling governmental interest' and does so by the 'least restrictive means.'" 544 U.S. at 712. In upholding RLUIPA's accommodation of religion, the Court emphasized that the provision "alleviates exceptional government-created

burdens on private religious exercise" while taking "adequate account of the burdens a requested accommodation may impose on nonbeneficiaries" and ensuring neutral application "among different faiths." *Id.* at 717-20 & n.6.

*Cutter* requires the same result here; the religious accommodations in the ACA also fall within the "corridor between the Religion Clauses." *Id.* at 720. The first accommodation exempts from the minimum coverage provision an individual certified as "a member of a recognized religious sect" described in section 1402(g)(1) of the Internal Revenue Code. Pub. L. No. 111-148, § 1501(b) (adding 26 U.S.C. § 5000A(d)(2)(A)). Section 1402(g)(1) of the Internal Revenue Code provides that an individual may file an application for an exemption from self employment tax if the individual is "conscientiously opposed to acceptance of the benefits of any private or public insurance" and is a member of a religious sect that makes "provision for [its] dependent members." 26 U.S.C. § 1402(g)(1). The ACA did not create the section 1402(g)(1) exemption. Congress passed it as part of the Social Security Amendments of 1965 "primarily because religious sects like the Old Order Amish provided for their own needy, independent of public or private insurance programs." *Varga v. United States*, 467 F. Supp. 1113, 1117 (D. Md. 1979) (citing S. Rep. No. 89-404, at 116 (1965)), *aff'd*, 618 F.2d 106 (4th Cir. 1980).

Since 1965, every federal court to consider the issue has upheld 26 U.S.C. § 1402(g)(1) under the Establishment Clause.[21] These decisions are sound. Like the RLUIPA provision

---

[21] *See Varga*, 467 F. Supp. at 1118; *Droz v. Comm'r*, 48 F.3d 1120, 1124 (9th Cir. 1995); *Hatcher v. Comm'r*, 688 F.2d 82, 83-84 (10th Cir. 1979); *Jaggard v. Comm'r*, 582 F.2d 1189, 1190 (8th Cir. 1978); *Henson v. Comm'r*, 66 T.C. 835, 838 (1976); *Palmer v. Comm'r*, 52 T.C. 310, 314-15 (1969); *see also Children's Healthcare Is a Legal Duty, Inc. v. De Parle*, 212 F.3d 1084, 1092 (8th Cir. 2000) (upholding a similar provision as consistent with the Establishment Clause).

49

upheld in *Cutter*, section 1402(g)(1) alleviates significant governmental interference with religious exercise by exempting from the minimum coverage requirement those who are conscientiously opposed to the purchase of insurance and are members of groups that have made provision for the dependent care of their members. Similar to RLUIPA, section 1402(g)(1) also properly accounts for the interests of non-beneficiaries and third parties, and it is appropriately "measured" so as not "to elevate accommodation of religious observances over . . . other significant interests." *Cutter*, 544 U.S. at 722. As the Supreme Court explained in *United States v. Lee*, 455 U.S. 252 (1982), the exemption in section 1402(g)(1) accommodates a "narrow category" that is "readily identifiable," *id.* at 261, a determination that reflects Congress's conclusion that this limited "financial threat to the [social security] system is supportable," *Olsen v. Comm'r*, 709 F.2d 278, 281 (4th Cir. 1983). And section 1402(g)(1) applies neutrally to members of all faiths, *Cutter*, 544 U.S. at 722, as it singles out no particular religious sect, instead identifying a characteristic that cuts across denominations. In other words, "Section 1402(g) does not discriminate among religions: it . . . grants a religious exemption, provided that the individual belongs to an organization with its own welfare system." *Droz v Comm'r*, 48 F.3d 1120, 1124 (9th Cir. 1995). As the Fourth Circuit has explained, the "secular goal of exempting religious exercise from regulatory burdens in a neutral fashion, as distinguished from advancing religion in any sense, is indeed permissible under the Establishment Clause." *Madison v. Riter*, 355 F.3d 310, 317 (4th Cir. 2003). In light of the fact that section 1402(g)(1) has been litigated and upheld under the Establishment Clause, this Court should not chart a different course with

regard to a provision in the ACA that grants the same exemption described in section 1402(g)(1). Pub. L. No. 111-148, § 1501(b) (adding 26 U.S.C. § 5000A(d)(2)(A)).

The second exemption from the minimum coverage provision passes constitutional muster under the same rationale. It excuses from the minimum coverage requirement a member of a "health care sharing ministry"—which is a group that "share[s] medical expenses among members in accordance with" a "common set of ethical or religious beliefs." 26 U.S.C. § 5000A(d)(2)(B). Like the section 1402(g)(1) exception, the exemption for members of health care sharing ministries is plainly an attempt to accommodate the religious practices of groups that have long-established mechanisms to provide for the medical care of their members. The accommodation is similarly measured, and consistent with the government's compelling interest in protecting the health and welfare of its citizens. And it is limited to religious groups that have made other provision for the care of their members; thus, it has not "unyieldingly weighted" the interests of religious objectors above the government's regulatory interests. *See Cutter*, 544 U.S. at 722. Finally, the exemption is neutral on its face, it does not distinguish among religious sects—rather, it is equally available to persons of any denomination who otherwise comply with its requirements.[22]

---

[22] Although the Court in *Cutter* expressly declined to apply the three-pronged test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), to legislative attempts to accommodate religion, *Cutter*, 544 U.S. at 718 n.6, the religious exemptions challenged here would also satisfy that test. Both exemptions serve the valid secular purpose of alleviating significant governmental interference with religious exercise. *See Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 335 (1987) ("It is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious [adherents] to define and carry out their religious missions."). Furthermore, neither exemption has the primary effect of advancing or inhibiting religion, nor does either foster excessive entanglement with religion. *See Droz*, 48 F.3d at 1124 ("[Section 1402(g)(1)] is a religious exemption narrowly drawn to maintain a fiscally sound Social Security system and to

## V.     THE RELIGIOUS EXEMPTIONS TO THE MINIMUM COVERAGE PROVISION ARE CONSISTENT WITH EQUAL PROTECTION

In Count VI, plaintiffs allege that the ACA's exemptions to the minimum coverage provision for some individuals, and the absence of a similar exemption for plaintiffs, violates plaintiffs' equal protection rights under the Fifth Amendment.  Second Am. Compl. ¶¶ 155-64. Notably, plaintiffs do not claim that having health insurance violates their religious beliefs. Rather, this claim is apparently premised on plaintiffs' erroneous and, in any event, unavailing claim that they are being forced to fund abortion coverage.  *Id.* ¶ 72.  That is, plaintiffs apparently believe that in 2014 they will be forced to purchase insurance plans that provide abortion coverage, and that the minimum coverage provision's religious exemptions, which do not include an exemption for those who oppose abortion, are discriminatory.  This claim should be rejected.

"The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike.'"  *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)).[23]  But "[p]roof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  *Hunter v. Underwood*, 471 U.S. 222, 227-28 (1985) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 at 264-65; *Washington v. Davis*, 426 U.S. 229, 240 (1976) (neutral law does not violate Equal

---

ensure that all persons are provided for, either by the Social Security system or by their church. . . . This is not a promotion of some religions over others.").  Thus, these provisions simply do not constitute the kind of "religious gerrymander" the Establishment Clause forbids.  *Gillette v. United States*, 401 U.S. 437, 452 (1971).

[23]  The Fifth Amendment imposes on the federal government the same equal protection standard required of legislative or administrative action taken by a state.  See *Schweiker v. Wilson*, 450 U.S. 221, 226 n.6 (1981); *Bolling v. Sharpe*, 347 U.S. 497 (1954).

Protection Clause solely because it results in a disproportionate impact; instead, the impact must be traced to a purpose to discriminate). Absent direct or unmistakable circumstantial evidence of discriminatory intent, courts generally will not find an equal protection violation.

There is no such "discriminatory intent or purpose" behind the ACA's minimum coverage exemptions. *Hunter*, 471 U.S. at 227-28. As explained earlier, the exemptions do not "discriminate among religions;" instead, they "grant[] a religious exemption, provided that the individual belongs to an organization with its own welfare system," *Droz*, 48 F.3d at 1124, that provides for the health care needs of its members. Neither exemption singles out a particular religious sect; instead, both identify characteristics that cut across denominations. And both exemptions serve the valid secular purpose of alleviating significant governmental interference with religious exercise. *See Corp. of Presiding Bishop*, 483 U.S. at 335 ("It is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious [adherents] to define and carry out their religious missions."); *Gillette v. United States*, 401 U.S. 437, 452 (1971). Heightened scrutiny therefore does not apply, and the exemptions here should be evaluated under the rational basis test. *Olsen*, 709 F.2d at 283 ("Heightened scrutiny is applied to an equal protection challenge to a regulation which applies selectively to religious activity only if the plaintiff can show the basis for the distinction was religious and not secular in nature.").

The minimum coverage provision's religious exemptions plainly pass muster under the rational basis test. Section 1402(g)(1) exempts an individual from self-employment tax based on the fact that the individual is a member of a religious group that has historically taken

53

responsibility for its members' welfare; for the same reasons, the ACA exempts from the minimum coverage requirement those individuals described in section 1402(g)(1). Those individuals who fall within the religious exemptions very likely will not incur the uncompensated care and lead to the cost-shifting that Congress was concerned about. *Varga*, 467 F. Supp. at 1117. Indeed, in the context of religious objections to paying Social Security taxes and receiving Social Security benefits, courts have consistently upheld section 1402(g) under rational basis review. *See Droz*, 48 F.3d at 1124-25; *Bethel Baptist Church v. United States*, 822 F.2d 1334, 1341-42 (3d Cir. 1987); *Templeton v. Comm'r*, 719 F.2d 1408, 1413-14 (7th Cir. 1983); *Ward v. Comm'r*, 608 F.2d 599, 601-02 (5th Cir. 1979).

The second exemption passes the rational basis test for substantially the same reasons. That exemption—26 U.S.C. § 5000A(d)(2)(B)—excuses from the minimum coverage provision members of "health care sharing ministr[ies,]" which are groups that provide for the care of their members by "shar[ing] medical expenses among members in accordance with [their religious or ethical] beliefs." *Id.* Congress was confident that members of health care sharing ministries would not incur uncompensated care, and therefore would not shift the costs of that care onto third parties. And Congress limited the exemption to groups formed before December 31, 1999, in order to cover only health care sharing ministries with an established record of providing medical care for their members and not relying upon uncompensated care. 26 U.S.C. § 5000A(d)(2)(B)(ii)(IV); *cf. Bethel Baptist Church*, 822 F.2d at 1342 ("Congress also narrowed the exemption, limiting it to sects able to make a showing of sustained adequate, religiously

dictated provision for members before December 31, 1950, because it concluded that a broad exemption might affect the soundness of the social security system.").

Plaintiffs' equal protection claim should accordingly be rejected.

## VI.    THE MINIMUM COVERAGE PROVISION IS NOT A DIRECT TAX OR A CAPITATION TAX

Plaintiffs challenge the minimum coverage provision as a "direct tax" or "capitation tax" that is not apportioned among the states, allegedly in violation of Article I, Sections 2 and 9 of the Constitution.  Second Am. Compl. ¶¶ 172-76.  That argument is doubly incorrect.  Measures enacted in aid of Congress's Commerce Clause powers are not subject to the apportionment requirement that can apply—but very rarely does—when Congress relies exclusively on its taxing powers.  Moreover, even if analyzed as an exercise of Congress's taxing authority, the minimum coverage provision is not a "direct tax" or "capitation tax" — historically, exceedingly narrow categories.

Article I, Section 8, Clause 1 of the Constitution grants Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises," but requires that "all Duties, Imposts and Excises shall be uniform throughout the United States."  Article I, Section 2 provides that "direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers."  U.S. Const. art. I, § 2, cl. 3 (amended by U.S. Const. amends. XIV, XVI).  Article I, Section 9 similarly provides that "[n]o Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken." *Id.*, art. I, § 9, cl. 4 (amended by U.S. Const. amend. XVI).

These requirements apply only to statutes enacted exclusively in the exercise of Congress's taxing power, and not to statutory penalties in aid of other constitutional authorities—including the Commerce Clause. In the *Head Money Cases (Edye v. Robertson)*, 112 U.S. 580, 595-96 (1884), the Supreme Court considered whether a fee levied on non-citizen passengers brought into a U.S. port complied with the uniformity requirement of Article I, Section 8. Although the fee appeared to satisfy the requirements of uniformity and general welfare applicable when Congress exercises its taxing power, the Court explained, such issues were beside the point because the fee was a "mere incident of the regulation of commerce." *Id.* at 595. The dispositive question was whether the fee was valid under the Commerce Clause, regardless of the limits of Congress's taxing authority. *Id.* at 596.

In accord with the *Head Money Cases*, the courts of appeals have repeatedly emphasized that "direct tax" claims offer no cause to set aside a statutory penalty enacted in aid of Congress's regulatory powers under the Commerce Clause. For example, after the Supreme Court upheld the Agricultural Adjustment Act's quota provisions under the Commerce Clause in *Wickard*, 317 U.S. 111, various plaintiffs argued that the penalties enforcing the quotas violated the rule of apportionment. *Rodgers v. United States*, 138 F.2d 992, 994 (6th Cir. 1943). The *Rodgers* court disagreed because the penalty was "adopted by the Congress for the express purpose of regulating the production of cotton affecting interstate commerce." *Id.* at 994-95. The incidental effect of raising revenue therefore did "not divest the regulation of its commerce

character," and Article I, Section 9 had "no application." *Id.* at 995 (*citing Head Money Cases*, 112 U.S. at 595).[24]

Even if the taxing power alone justifies the minimum coverage provision, the direct tax clause would still not be implicated here. The rule of apportionment was part of the compromise that counted slaves as three-fifths of a person. *See* Bruce Ackerman, Taxation and the Constitution, 99 Colum. L. Rev. 1, 8-13 (Jan. 1999). Any effort, for example, to impose a tax on slaves would fall disproportionately on non-slaveholding states, as it would have to be apportioned by population, with the slave-holding states paying less per capita because of the three-fifths rule. As Justice Paterson explained in one of the Court's first landmark opinions, the "rule of apportionment" was "the work of a compromise" that "cannot be supported by any solid reasoning" and that "therefore, ought not to be extended by construction." *Hylton v. United States*, 3 U.S. (3 Dall.) 171, 178 (1796) (opinion of Paterson, J.). Accordingly, from the beginning of the Republic, the Court has construed capitation or other direct taxes narrowly to mean only head or poll taxes and taxes on property.[25]

When, some 115 years ago, the Supreme Court expanded the definition of a "direct tax" to include a tax on personal property, as well as on income derived from real or personal property, *Pollock v. Farmers' Land & Trust Co.*, 158 U.S. 601 (1895), the American people adopted the Sixteenth Amendment to the Constitution repudiating the latter aspect of the holding,

---

[24] Other circuits agree. *United States v. Stangland*, 242 F.2d 843, 848 (7th Cir. 1957); *Moon v. Freeman*, 379 F.2d 382, 390-93 (9th Cir. 1967); *see also South Carolina ex rel. Tindal v. Block*, 717 F.2d 874 (4th Cir. 1983); *Goetz v. Glickman*, 149 F.3d 1131 (10th Cir. 1998).

[25] *See Springer v. United States*, 102 U.S. 586, 602 (1881); *Veazie Bank v. Fenno*, 75 U.S. (8 Wall.) 533, 543 (1869); *Hylton v. United States*, 3 U.S. (3 Dall.) 171 (1796).

*see Brushaber v. Union Pac. R. Co.*, 240 U.S. 1, 19 (1916).  The continued validity of the first aspect of the holding is also in doubt.  *See* Ackerman, 99 Colum. L. Rev. at 51-52.  At most, what remains of *Pollock* stands only for the proposition that a general tax on the whole of an individual's personal property would be direct.  *See Union Elec. Co. v. United States*, 363 F.3d 1292, 1300 (Fed. Cir. 2004).  In sum, whether or not any part of *Pollock* survives, the Court has since made clear that only a tax imposed on property, "solely by reason of its ownership," is a "direct tax."  *Knowlton v. Moore*, 178 U.S. 41, 81 (1900).

There is no sensible basis to claim that the minimum coverage provision imposes taxes on property, real or personal.  It is not tied to the value of an individual's property.  It instead imposes a penalty on the choice of a method to finance the future costs of one's health care, a decision made against the backdrop of a regulatory scheme that effectively guarantees emergency care and requires insurance companies to allow people to purchase insurance after they are already sick.  A penalty predicated on a decision, as opposed to a tax on property, has always been understood to be indirect.  *United States v. Mfrs. Nat'l Bank of Detroit*, 363 U.S. 194, 197-98 (1960); *Tyler v. United States*, 281 U.S. 497, 502 (1930).

Nor is the minimum coverage provision a "capitation tax."  Justice Chase explained that a capitation (or poll, or head) tax is one imposed "simply, without regard to property, profession, or any other circumstance."  *Hylton*, 3 U.S. at 175 (opinion of Chase, J.); *see also Pac. Ins. Co. v. Soule*, 74 U.S. 443, 444 (1868) (adopting Justice Chase's definition).  The minimum coverage provision is not a flat tax imposed without regard to the individual's circumstances.  To the contrary, among other exemptions, the Act excuses persons with household incomes below the

threshold for filing a return and persons for whom the cost of coverage would exceed 8 percent of household income. 26 U.S.C. § 5000A(e)(1), (2).[26] Furthermore, the penalty varies with the individual's income, subject to a floor of a particular dollar amount, and to a cap equal to the cost of qualifying coverage. *Id.* § 5000A(c)(1), (2). And, of course, the penalty does not apply at all if an individual obtains qualifying coverage. *Id.* § 5000A(a), (b)(1). The minimum coverage provision thus is tailored to the individual's circumstances and is not a capitation tax.

## VII.  PLAINTIFFS LACK STANDING TO ASSERT THEIR OTHER CHALLENGES

In the complaint's statement of facts, plaintiffs appear to challenge Congress's power to convert properly commissioned members of the Public Health Service ("PHS") Reserve Corps into members of the Regular Corps. Second Am. Compl. ¶¶ 77, 79. Plaintiffs also seem to challenge Congress's four-year funding appropriation for the PHS Commissioned Corps and Ready Reserve Corps. *Id.* ¶¶ 78-79.[27] These chimerical claims do not appear as one of the counts of plaintiffs' complaint (but do briefly reappear in paragraph 179 of Count IX). Whether, how, or on what basis plaintiffs intend to pursue these claims is unclear. But this Court need not resolve the mystery, as plaintiffs plainly lack standing to sue. These challenges are textbook examples of generalized grievances, which "are not cognizable in the federal courts." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 616 (1989).

---

[26] Even if the minimum coverage provision would have been viewed as a direct tax prior to the Sixteenth Amendment, given that Congress designed the minimum coverage provision penalty potentially to vary in proportion to the individual's income, 26 U.S.C. § 5000A(c)(1)(B), (c)(2), it would now fall within Congress's authority to "to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration." U.S. Const. amend. XVI.

[27] Plaintiffs also refer to the HCERA's changes to the federally-guaranteed student loan program, *id.* ¶ 89, but do not assert that these changes are unconstitutional.

**CONCLUSION**

The government's motion to dismiss should be granted.

DATED:  August 13, 2010                    Respectfully submitted,

                                           TONY WEST
                                           Assistant Attorney General

                                           IAN HEATH GERSHENGORN
                                           Deputy Assistant Attorney General

                                           TIMOTHY J. HEAPHY
                                           United States Attorney
                                           Western District of Virginia

                                           JENNIFER RIVERA
                                           Director

                                           SHEILA LIEBER
                                           Deputy Director

                                           s/ Ethan P. Davis
                                           ETHAN P. DAVIS (N.Y. Bar)
                                           KAREN P. SEIFERT (N.Y. Bar)
                                           Attorneys for Defendants
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Ave. NW
                                           Washington, DC 20530
                                           Tel: (202) 514-9242
                                           Fax: (202) 616-8470
                                           Ethan.P.Davis@usdoj.gov