# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

NOV 3 0 2010

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

LIBERTY UNIVERSITY, INC., a Virginia
Nonprofit Corporation, MICHELE G.
WADDELL, DAVID STEIN, M.D., JOANNE V.
MERRILL, DELEGATE KATHY BYRON, and JEFF
HELGESON,

        *Plaintiffs,*

        v.

TIMOTHY GEITHNER, Secretary of the Treasury
of the United States, *in his official capacity*,
KATHLEEN SEBELIUS, Secretary of the United
States Department of Health and Human
Services, *in her official capacity*,
HILDA L. SOLIS, Secretary of the United States
Department of Labor, *in her official capacity*,
and ERIC HOLDER, Attorney General of the
United States, *in his official capacity*,

        *Defendants.*

CASE NO. 6:10-cv-00015-nkm

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

On the day the President signed into law the Patient Protection and Affordable Care Act of 2009, Plaintiffs filed this action, contesting the law's validity on constitutional and statutory grounds. Defendants (several government officials named in their official capacities) moved to dismiss the suit for lack of jurisdiction and for failure to state a claim on which relief can be granted. The parties' arguments have been fully briefed and heard, and for the reasons stated in this memorandum, I will grant Defendants' Motion to Dismiss (docket no. 25).

# I. BACKGROUND

Plaintiffs Liberty University, Inc., Michele G. Waddell, David Stein, M.D., Joanne V. Merrill, Delegate Kathy Byron, and Council Member Jeff Helgeson (collectively "Plaintiffs") challenge the legality of certain provisions of the Patient Protection and Affordable Care Act of 2009, Pub. L. No. 111-148, 124 Stat. 119 (Mar. 23, 2010), as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (Mar. 30, 2010) (collectively, the "Act"). Plaintiffs seek a declaration that the Act is unconstitutional and invalid and an order enjoining its enforcement. Defendants in this action are the following government officials, named in their official capacities: Timothy Geithner, Secretary of the Treasury; Kathleen Sebelius, Secretary of the United States Department of Health and Human Services; Hilda L. Solis, Secretary of the United States Department of Labor; and Eric Holder, Attorney General of the United States. This is not the first judicial ruling on a challenge to the Act.[1]

The Act institutes numerous reforms to the national health care market. It removes many barriers to insurance coverage,[2] supplies federal funds and expands Medicaid to assist the poor with obtaining coverage,[3] and encourages small businesses to purchase health insurance for their employees through tax incentives.[4] It creates health benefit exchanges, which are established and operated by states to serve as marketplaces where informed individuals and small businesses can enroll in health plans after comparing their features. *See* Act § 1311. The Act also requires

---

[1] *See Commonwealth of Virginia Ex Rel. Cuccinelli v. Sebelius*, 702 F. Supp. 2d 598 (E.D. Va. 2010); *Baldwin v. Sebelius*, No. 10-cv-1033, 2010 U.S. Dist. LEXIS 89192, 2010 WL 3418436 (S.D. Cal. Aug. 27, 2010); *Thomas More Law Ctr. v. Obama*, --- F. Supp. 2d ----, No. 10-cv-11156, 2010 U.S. Dist. LEXIS 107416, 2010 WL 3952805 (E.D. Mich. Oct. 7, 2010); *Florida ex rel. McCollum v. U.S. Dep't Health & Human Servs.*, 716 F. Supp. 2d 1120 (N.D. Fla. 2010).

[2] *See* Act §§ 1101, 1201 (prohibiting insurers from denying coverage or increasing the price of coverage for individuals with preexisting medical conditions, from rescinding coverage or declining to renew coverage based on health status, and from capping the amount of coverage available to a policyholder).

[3] *See* Act §§ 1401-02 (providing premium tax credits and reduced cost-sharing options for individuals and families with income between 100 and 400 percent of the poverty line); *id.* § 2001 (expanding Medicaid eligibility to individuals with income below 133 percent of the federal poverty level).

[4] *See* Act § 1421.

certain large employers to offer health insurance to their employees and requires all individuals who do not meet a statutory exemption to purchase and maintain health insurance. Plaintiffs challenge these mandatory coverage provisions.

The "Shared Responsibility for Employers" provision of the Act, § 1513 (adding 26 U.S.C. § 4980H) (hereinafter "employer coverage provision" or "employer coverage requirement"), regulates the level and quality of health coverage that large employers provide to their employees. It provides that if an "applicable large employer . . . fails to offer to its full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan . . . for any month" and at least one full-time employee receives a "premium tax credit or cost-sharing reduction" through a health benefit exchange, then a civil fine is imposed on the employer. Act § 1513(a), (d). An "applicable large employer" is one who employs fifty or more full-time employees on average over a calendar year. Act § 1513(c)(2). The employer coverage provision goes into effect in 2014. Act § 1513(d).

According to the "Requirement to Maintain Minimum Essential Coverage," § 1501 (adding 26 U.S.C. § 5000A) (hereinafter "individual coverage provision" or "individual coverage requirement") every "applicable individual" must obtain "minimum essential coverage" for each month or pay a penalty, which is included with the individual's tax return. Act § 1501(a)-(b). An "applicable individual" is any individual except one who qualifies for a religious exemption, who is not a United States citizen, national, or an alien lawfully present in the United States, or who is incarcerated. Act § 1501(d).[5] The individual coverage provision takes effect in 2014. Act § 1501(a).

---

[5] An "applicable individual" may still be exempted from the requirement to purchase health insurance if she cannot afford such coverage because the required contribution exceeds eight percent of her household income. Act § 1501(e). Taxpayers with income under 100 percent of the poverty line, members of Indian tribes, and individuals determined to suffer "a hardship" with respect to the capability to obtain coverage are also exempted. *Id.*

There are two religious exemptions to the requirement that individuals maintain minimum essential coverage. First, the "Religious conscience exemption" applies to an individual who "is a member of a recognized religious sect or division thereof described in section 1402(g)(1) and an adherent of established tenets or teachings of such sect or division as described in such section." Act § 1501(d)(2)(A). Section 1402(g)(1) exempts from the Internal Revenue Code any "member of a recognized religious sect or division thereof [who] is an adherent of established tenets or teachings of such sect or division by reason of which he is conscientiously opposed to acceptance of the benefits of any private or public insurance" which insures death, disability, retirement, or health care costs. 26 U.S.C. § 1402(g)(1). Second, the "Health care sharing ministry" exemption applies to a member of a 501(c)(3) organization, which has been in existence at all times since December 31, 1999, the members of which share a common set of ethical or religious beliefs, share medical expenses in accordance with those beliefs, and retain membership even after developing a medical condition. Act § 1501(d)(2)(B).

Plaintiffs state that they are a Christian organization and Christian individuals holding religious beliefs that most or all forms of abortion are immoral (Second Am. Compl. ¶ 72), and they claim that the Act does not protect against the mandatory insurance payments being used to fund abortion coverage. The Act explicitly states that no plan is required to cover any form of abortion services. Act § 1303(b)(1)(A)(1). In every state health benefit exchange, there must be offered at least one plan that does not provide coverage of non-excepted abortion services, § 1334(a)(6), which, under current law, are any type of abortion services except in cases of rape or incest or where the life of the woman is endangered, *Exec. Order No. 13,535 of Mar. 24, 2010*, 75 Fed. Reg. 15,599 (Mar. 29, 2010). Any state may pass a law prohibiting health plans

offered through that state's health benefit exchange from covering *any* form of abortion services. Act § 1303(a)(1).

Plaintiffs allege that the employer and individual coverage provisions are beyond Congress' Article I powers (Count One), violate the Tenth Amendment (Count Two), violate the Establishment Clause of the First Amendment (Count Three), violate the Free Exercise Clause of the First Amendment (Count Four), violate the Religious Freedom Restoration Act (Count Five), violate the equal protection component of the Due Process Clause of the Fifth Amendment (Count Six), violate the right to free speech and free association under the First Amendment (Count Seven), violate the Article I, Section 9 prohibition against unapportioned capitation or direct taxes (Count Eight), and violate the Guarantee Clause (Count Nine). Defendants move to dismiss Plaintiffs' claims in their entirety pursuant to Federal Rule of Civil Procedure 12(b)(1) and Rule 12(b)(6). Defendants argue that the Court lacks subject matter jurisdiction to hear their claims because Plaintiffs do not have standing, the issues are unripe, and the Anti-Injunction Act withdraws jurisdiction over their suit. If jurisdiction is found, Defendants argue that all of the counts should be dismissed for failure to state a claim upon which relief can be granted.

## II. APPLICABLE LAW

### A. Rule 12(b)(1), Subject Matter Jurisdiction

On a Rule 12(b)(1) motion, the plaintiff bears the burden of proving that subject matter jurisdiction exists. *Piney Run Pres. Ass'n v. County Comm'rs*, 523 F.3d 453, 459 (4th Cir. 2008). In considering the motion, a court must accept as true all material factual allegations in the complaint and must construe the complaint in favor of the plaintiff. *Warth v. Seldin*, 422 U.S. 490, 501 (1975). A court should "regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for

summary judgment." *Evans v. B. F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). The moving party's motion to dismiss should be granted when "the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

## B. Rule 12(b)(6), Failure to State a Claim

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and quotations omitted). A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). "Factual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, with all the allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor, *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 346 (4th Cir. 2005). In sum, Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Consequently, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. ----, ----, 129 S. Ct. 1937, 1950 (2009).

### III. Jurisdiction

Defendants raise three grounds for dismissing the complaint for lack of jurisdiction pursuant to Rule 12(b)(1): Plaintiffs lack standing, the claims are unripe, and the suit is barred by the Anti-Injunction Act.

### A. Standing

Article III of the Constitution limits federal-court jurisdiction to "Cases" and "Controversies." *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007). Standing to sue is an aspect of the case or controversy requirement. The doctrine of standing serves to identify those disputes that are "appropriately resolved through the judicial process." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, Plaintiffs must show that: (1) they "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there [is] a causal connection between the injury and the conduct complained of"; and (3) "it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560-61 (citations and quotations omitted). An interest shared generally with the public at large in the proper application of the Constitution and laws will not do. *See id.* at 573-76.

"The party invoking federal jurisdiction bears the burden of establishing" the elements of standing. *Id.* at 561. The plaintiff must support each element of the standing requirement with "the manner and degree of evidence" required at the motion to dismiss stage. *Id.* In the past, this meant that the plaintiff's allegations were accepted as true. *See, e.g., Pennell v. San Jose*, 485 U.S. 1, 7 (1988). The decisions of the Supreme Court of the United States in *Iqbal* and *Twombly*, however, clarify that, to survive a motion to dismiss, the plaintiff's allegations must present sufficient facts to be plausible. *Iqbal*, 129 S. Ct. at 1950; *Twombly*, 550 U.S. at 570.

Standing is determined as of the date the complaint was filed. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000) ("[W]e have an obligation to assure ourselves that [the plaintiff] had Article III standing at the outset of the litigation."); *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003) (collecting cases).

At the outset, I find that Plaintiffs Delegate Kathy Byron, Council Member Jeff Helgeson,[6] and David Stein, M.D.[7] lack standing, and I will dismiss them from the suit.

Plaintiff Liberty University, Inc. ("Liberty") is a nonprofit corporation organized under Virginia law that operates a private Christian university and employs approximately 3,900 full-time employees. (Second Am. Compl. ¶¶ 8, 28; Pls.' Opp'n 2.) Liberty "makes available health savings accounts, private insurance policies and other healthcare reimbursement options to qualified employees under a salary reduction program." (Second Am. Compl. ¶ 29.) As of the date of the filing of the second amended complaint, 1,879 employees of Liberty chose to participate in its health insurance coverage; other employees opted not to participate. (*Id.* ¶¶ 29-

---

[6] Kathy Byron is a member of the House of Delegates of the Commonwealth of Virginia, and she voted for the Virginia Health Care Freedom Act, Va. Code § 38.2-3430.1:1 (2010), which declared that no state resident is required to purchase individual health insurance coverage. (Second Am. Compl. ¶ 39.) Jeff Helgeson is a Lynchburg, Virginia city council member and objects to the Act because it "will have a negative impact on the city of Lynchburg, generally, and his district, in particular." (*Id.* ¶¶ 13, 41.) Plaintiffs' arguments that Byron and Helgeson have standing based on their status as legislators or on their policy objections to the Act plainly fail. *See Raines v. Byrd*, 521 U.S. 811, 822-26 (1997) (limiting scope of standing for legislators claiming an institutional injury); *United States v. Richardson*, 418 U.S. 166, 172 (1974) (finding that a plaintiff must show a personalized injury, "not merely that he suffers in some indefinite way in common with people generally"); *McConnell v. FEC*, 540 U.S. 93, 227 (2003) (rejecting voters' injuries as too "broad and diffuse" to entitle them to standing). Plaintiffs argue in the alternative that Byron and Helgeson have standing because they will have to comply with the individual coverage requirement. (Pls.' Opp'n 9.) But nowhere in the pleadings do Plaintiffs allege that Byron and Helgeson do not already have health insurance and will suffer an injury to obtain it.

[7] Dr. David Stein is a licensed and practicing medical doctor who is opposed to the Act because he believes it will not provide quality care to more patients at lower cost. (Second Am. Compl. ¶¶ 10, 36.) To support his standing in this litigation Plaintiffs allege that regulations that likely will be passed pursuant to the Act may change the rate at which he can seek reimbursements for Medicaid and Medicare patients (*id.* ¶ 37) and will interfere with his "liberty interest in practicing his profession and providing essential health care services for his patients" (*id.* ¶ 35). These pleadings are too vague and conclusory to support standing—they do not specify which provisions of the Act harm Dr. Stein or how they do so. Dr. Stein appears to raise mere policy disagreements with the Act. This litigation is not the proper forum to air those grievances.

30.) Liberty's health plan does not cover abortion, and "[a]bortion is contrary to the Christian mission of Liberty." (*Id.* ¶¶ 32-33.) Liberty represents that its current level of coverage "will almost certainly be determined insufficient" under the Act. (Pls.' Opp'n 3.)

Liberty challenges the constitutionality of the employer coverage provision, which, when it goes into effect in 2014, will require Liberty as an employer of more than fifty full-time employees to offer its employees the opportunity to enroll in minimum essential coverage, or face civil penalties.[8] Liberty alleges that the provision will increase Liberty's cost of providing health insurance coverage when it goes into effect (Second Am. Compl. ¶ 106), and Liberty also represents that, as it takes steps to comply with the provision, it will incur "significant and costly changes" in its daily business operations well before 2014 (Pls.' Opp'n 9). As a large nonprofit organization, it claims that in the near future, it will have to rearrange its financial affairs to provide the requisite coverage, or budget for the penalties that it would incur for being out of compliance. (Pls.' Opp'n 6.) According to Liberty, such costs "cannot be postponed until the day that the law's provisions become effective." (*Id.*)

Plaintiffs Michele G. Waddell and Joanne V. Merrill make similar arguments for standing. Waddell and Merrill are individuals who do not have health coverage and do not wish to purchase it. (Second Am. Compl. ¶¶ 34, 38.) They state that they are Christians and have "sincerely held religious beliefs" that abortion is "murder and morally repugnant" and that they should not be obliged to support abortions in any way or "formally associate with" those who support abortions in any way. (*Id.* ¶¶ 71-76.) Waddell and Merrill challenge the validity of the

---

[8] Liberty also challenges certain elements of the individual coverage provision. Where generalized declaratory and injunctive relief is sought, if one individual plaintiff demonstrates standing, the court need not inquire whether other plaintiffs have standing to assert the same claim. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Because I find below that Waddell and Merrill have alleged sufficient facts to support their standing to challenge the individual coverage provision, I do not need to decide whether Liberty also has demonstrated standing.

individual coverage requirement and various other provisions of the Act. They argue that, before the individual coverage requirement takes effect in 2014, they will have to make "significant and costly changes" in their personal financial planning, necessitating "significant lifestyle . . . changes" and extensive reorganization of their personal and financial affairs. (Pls.' Opp'n 6, 9.)[9]

Defendants contend that Plaintiffs Liberty, Waddell, and Merrill have not shown an injury in fact based on the obligation to purchase insurance for themselves or their employees, or based on the possibility of suffering a penalty for noncompliance, because those injuries will not take place until 2014 at the earliest, and thus are not imminent. The Supreme Court has acknowledged that imminence is "a somewhat elastic concept," but has defined it as at least a "*certainly* impending" injury. *Lujan*, 504 U.S. at 564 n.2. Defendants also argue that it is speculative whether or not Plaintiffs will even be subject to the coverage provisions. Defendants maintain that Liberty only alleged that it "*could be*" in violation of the employer coverage requirement when it goes into effect, leaving open the possibility that its current level of coverage offered may satisfy the requirements of the Act. (Defs.' Mem. Supp. Mot. Dismiss 14.) In addition, Defendants contend that any number of circumstances may intervene to relieve Waddell and Merrill of the obligation to purchase individual health insurance in 2014: they may find employment that offers health insurance, qualify for Medicaid or Medicare, qualify for an exemption under the Act such as that for low-income individuals, or illness or injury may force them to obtain health insurance independent of the Act's mandate. (*See id.* at 15-16.)

At the motion to dismiss stage, Plaintiffs shoulder a lightened burden to support their factual allegations of injury in fact and causation. Plaintiffs need not set forth by evidence specific facts, as they would have to at the summary judgment stage, *Lujan*, 504 U.S. at 561, but

---

[9] Although in most places in their brief Plaintiffs phrase the injury to Liberty, Waddell, and Merrill as one that will occur in the near future, at points Plaintiffs state that injury has already occurred. (*See* Pls.' Opp'n 10, 13.)

need only provide general factual allegations that are plausible. With this standard in mind, I hold that Plaintiffs' allegations of injury in fact and causation are within the realm of factual plausibility and sufficient to establish standing at this stage of the litigation.

The present or near-future costs of complying with a statute that has not yet gone into effect can be an injury in fact sufficient to confer standing. In *Virginia v. American Booksellers Ass'n, Inc.*, a group of booksellers brought a facial challenge to a state law prohibiting the knowing display for commercial purposes of certain material deemed harmful to juveniles on the basis that the law violated the First Amendment rights of adults. 484 U.S. 383 (1988). The state argued in defense that the plaintiff booksellers lacked standing because the law had not become effective at the time of their suit, and that any present economic harm they suffered was insufficient to show injury in fact. *Id.* at 392. The Court rejected those arguments and held that the booksellers had standing because upon the booksellers' interpretation of the law, they would "have to take significant and costly compliance measures or risk criminal prosecution." *Id.* As long as plaintiffs had "alleged an actual and well-founded fear that the law [would] be enforced against them," their case could proceed. *Id.* at 393.

The facts of *American Booksellers* are similar to those here. In the present suit, Plaintiffs allege that they will have to undertake a significant and costly reorganization of their financial affairs in order to comply with the Act when it takes effect or risk heavy civil penalties. Parts of the Act have already taken effect, and the employer and individual coverage requirements are to take effect in 2014. Plaintiffs' allegations plausibly state that, were the Act in force today, Plaintiffs would be obligated by the health insurance coverage requirements to purchase or provide coverage. Although Defendants are correct that there is some uncertainty whether, in 2014, Plaintiffs will continue to fall under the auspices of the Act, Plaintiffs' allegations, which I

take as true, show that they have good reason to believe they will. Because the future expenditure required by the Act entails significant financial planning in advance of the actual purchase of insurance in 2014, Plaintiffs allege that they must incur the preparation costs in the near term, without knowledge of what their status under the Act will be in 2014. *See Thomas More Law Ctr.*, 2010 U.S. Dist. LEXIS 107416, at *11-12.

I do not rest on *American Booksellers* alone. Other courts have recognized that the *present*, detrimental effect on a plaintiff of a future *contingent* liability can constitute an injury in fact. *See Lac Du Flambeau Band of Lake Superior v. Norton*, 422 F.3d 490, 498 (7th Cir. 2005) ("[T]he present impact of a future though uncertain harm may establish injury in fact for standing purposes."); *Jones v. Gale*, 470 F.3d 1261, 1267 (8th Cir. 2006) (holding plaintiffs had standing "to challenge the constitutionality of a law that has a direct negative effect on their borrowing power, financial strength, and fiscal planning") (quotations omitted); *Protocols, LLC v. Leavitt*, 549 F.3d 1294, 1298-1301 (10th Cir. 2008) (finding that consultants whose present "financial strength and fiscal planning" was hampered by an agency interpretation of Medicare regulations that created liability for the consultants had standing to challenge the interpretation, even though the liability was contingent on Medicare paying certain expenses then seeking reimbursement); *cf. Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937) (allowing to proceed suit by insurer against policyholder who claimed insurer was liable for disability payments but policyholder had not yet sought payment). For example, in *Lac Du Flambeau Band*, the United States Court of Appeals for the Seventh Circuit, on a motion to dismiss, found that the plaintiff Indian tribe suffered present economic injury in the form of a higher cost of capital from a compact that made the state's rejection of the tribe's casino application more likely, even though the injury depended first on federal approval of the application. 422 F.3d at 498. Presently felt

economic pressure, like that Plaintiffs claim to experience from the employer and individual coverage provisions, may originate from a future event that is in some respects uncertain to occur. Indeed, Plaintiffs' alleged injuries are not even contingent on the occurrence of a future event—if the employer and individual coverage provisions went into effect today, Plaintiffs allege that they would have to comply. Because of the delay in the effective date of the provisions, there is merely some uncertainty whether Plaintiffs will be in the same position in 2014 as they are in today.

Defendants argue that a plaintiff "could always assert a current need to prepare for the most remote and ill-defined harms" but that should not be sufficient to establish an injury in fact. (Defs.' Reply 4.) But the harm faced by Plaintiffs is not remote or ill-defined—in 2014, the provisions, which are already signed into law, will trigger the statutory requirement to purchase health insurance, and that obligation is weighty enough to require costly and advance financial preparation. The connection between the future harm and the alleged present injury is reasonably direct. In any case, recognizing standing for this type of injury does not make the courts vulnerable to plaintiffs bypassing traditional standing requirements to get into court. The need to show a concrete, particularized economic injury that is fairly traceable to the challenged conduct and redressable by the suit remains. In addition, the factual allegations about presently incurred compliance costs must have evidentiary support or the claims will be dismissed at successive stages of litigation when affidavits or evidence at trial are needed to support them. Attorneys or unrepresented parties could be subject to sanction under Federal Rule of Civil Procedure 11 for alleging facts that do not have evidentiary support. Furthermore, the allegations of preparation costs must be plausible, which in most frivolous claims they would not

be. Finally, if something happens to change Plaintiffs' circumstances in the future, the case may become moot. *See Becker v. FEC*, 230 F.3d 381, 386 n.3 (1st Cir. 2000).

Defendants also take the position that the near-term compliance costs are not fairly traceable to the employer and individual coverage provisions, but rather could stem from any number of factors. (Defs.' Reply 4-5.) A plaintiff's alleged injury is not "fairly traceable" to a challenged provision if that injury "stems not from the operation of [the provision] but from [his] own . . . personal choice." *McConnell v. FEC*, 540 U.S. 93, 228 (2003). Taking the allegations as true, it is clear that the significant adjustments that Plaintiffs must make to their financial affairs in anticipation of the mandatory coverage requirements are fairly traceable to the Act's requirements. The coverage provided by Liberty as of the filing of the complaint encompassed 1,879 employees and enrollment was optional; under the Act, Liberty alleges it would have to make coverage available for all 3,900 of its full-time employees. (Tr. 47:14-48:2.) Liberty has made clear that it does not want to undertake the expansion in coverage that would be required by the Act, so it would not otherwise incur the near-term costs attendant to doing so. Similarly, the Act requires Waddell and Merrill to purchase insurance when they otherwise would not do so.

That those subject to the requirement to purchase insurance will need to make significant and costly changes well before the requirement takes effect is certainly a reasonable allegation. Liberty is a large nonprofit institution with thousands of employees, and under the employer coverage provision, it will need to offer affordable coverage to all of its full-time employees. Waddell and Merrill are individuals whose financial budgets do not include health insurance, and in order to accommodate the substantial cost of purchasing a policy, they will arguably need to make lifestyle changes. "There is nothing improbable about the contention" that the employer

and individual coverage requirements cause Plaintiffs "to feel economic pressure today." *Thomas More Law Ctr.*, 2010 U.S. Dist. LEXIS 107416, at *11. The allegations to support standing are plausible and sufficiently specific to survive the motion to dismiss.

## B. Ripeness

Plaintiffs' claims must also be ripe for adjudication. The requirement that a matter be ripe "prevents judicial consideration of issues until a controversy is presented in clean-cut and concrete form." *Miller v. Brown*, 462 F.3d 312, 318-19 (4th Cir. 2006) (quotation omitted). "[R]ipeness is peculiarly a question of timing . . . ." *Blanchette v. Conn. Gen. Ins. Corp. (Reg'l Rail Reorganization Act Cases)*, 419 U.S. 102, 138-39 (1974). In determining whether a matter is ripe, the court must "decide whether the issue is substantively definitive enough to be fit for judicial decision and whether hardship will result from withholding court consideration." *Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 602 (4th Cir. 1997) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *modified on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller*, 462 F.3d at 319; *see also Texas v. United States*, 523 U.S. 296, 300-01 (1998). Hardship is determined by "the immediacy of the threat and the burden imposed on the petitioner who would be compelled to act under threat of enforcement of the challenged law." *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208-09 (4th Cir. 1992). The burden of proving ripeness is on the party bringing the action. *Miller*, 462 F.3d at 319.

The issues raised in the standing and ripeness arguments overlap, *see Miller*, 462 F.3d at 319, and to the extent that I have addressed them in the discussion on standing above, I will not rehash them at length here. On this facial challenge, the issues to be decided are purely legal in

nature and further development of the factual record would not clarify the issues for judicial resolution. Although the challenged provisions of the Act will not take effect for years, Plaintiffs have sufficiently alleged that in the present or near future they are or will be burdened by the need to undertake significant and costly changes in their financial affairs and lifestyles in order to be prepared to comply with the Act. *See Am. Booksellers*, 484 U.S. at 392-93 (finding jurisdiction for a pre-enforcement suit where plaintiff booksellers would have to take costly compliance measures to avoid criminal prosecution). The challenged provisions create a direct and immediate dilemma, forcing Plaintiffs to choose between extensively reorganizing their financial affairs before the provisions go into effect, or risking heavy civil penalties. Under *Abbott Laboratories*, such a predicament satisfies the hardship requirement of the ripeness inquiry. *See Abbott Labs.*, 387 U.S. at 152-53 (holding pre-enforcement challenge ripe because regulation had "a direct effect on the day-to-day business" of prescription drug companies by forcing them to either re-label drug products at great expense or risk serious criminal and civil penalties). I am satisfied that Plaintiffs have met their burden at this stage in the litigation to allege their suit is not premature.

### C. Anti-Injunction Act

Defendants urge that Plaintiffs' assertions are barred by the Anti-Injunction Act, 26 U.S.C. § 7421(a). The Anti-Injunction Act, which is located in the Internal Revenue Code, provides, in pertinent part, that

> no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.

26 U.S.C. § 7421(a). The two primary objectives of the Anti-Injunction Act are "[1] to allow the federal government to assess and collect allegedly due taxes without judicial interference and

[2] to compel taxpayers to raise their objections to collected taxes in suits for refunds." *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 584 (4th Cir. 1996); *accord South Carolina v. Regan*, 465 U.S. 367, 376 (1984); *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974).[10]

The individual coverage provision, which added § 5000A to the Internal Revenue Code, provides that a failure to maintain individual minimum essential coverage results in "a penalty" imposed on the offending taxpayer, which is to be included on the taxpayer's return for the taxable year in which the violation occurred. Act § 1501(b). The Act provides that the penalty for violation of the individual coverage requirement "shall be assessed and collected in the same manner as an assessable penalty under [26 U.S.C. §§ 6671 *et seq.*]." Act § 1501(g)(1).[11] Likewise, the employer coverage provision, which added § 4980H to the Internal Revenue Code, provides that the failure to offer employees the opportunity to enroll in health coverage results in "an assessable penalty" which "shall be assessed and collected in the same manner as an assessable penalty under [26 U.S.C. §§ 6671 *et seq.*]." Act § 1513(a), (d).

Section 6671 states

> (a) Penalty assessed as tax. The penalties and liabilities provided by this subchapter shall be paid upon notice and demand by the Secretary, and shall be assessed and collected in the same manner as taxes. Except as otherwise provided, any reference in this title to 'tax' imposed by this title shall be deemed also to refer to the penalties and liabilities provided by this subchapter.

26 U.S.C. § 6671(a).

Defendants take the position that the penalties for violating the employer and individual coverage provisions are to be assessed and collected in the same manner as the penalties under

---

[10] The Anti-Injunction Act is coextensive with the Declaratory Judgment Act, 28 U.S.C. § 2201(a), which withdraws federal court authority to grant declaratory relief in federal tax cases. *Leckie*, 99 F.3d at 583; *see also Sigmon Coal Co. v. Apfel*, 226 F.3d 291, 299 (4th Cir. 2000). If the Anti-Injunction Act does not bar the claims, neither does the Declaratory Judgment Act. *Id.*

[11] Notwithstanding § 1501(g)(1), failure to pay the penalty does not result in criminal sanctions or a lien or levy on the taxpayer's property. Act § 1501(g)(2).

§ 6671, and § 6671 states that references to "tax" in the Internal Revenue Code are deemed also to refer to penalties. Thus, Defendants ask the Court to conclude that the reference to "tax" in the Anti-Injunction Act encompasses the penalties set forth in the Act. Characterizing this action as a suit for the purpose of restraining the assessment and collection of a tax, Defendants contend that the Court is without jurisdiction.

Defendants' argument is unconvincing. The Act merely directs that the penalties it imposes are to be "assessed and collected" in the same manner as the penalties under § 6671. Assessment and collection refers to the manner in which the amount of the tax is determined and the method by which the payment for the tax is gathered. Instructions to assess and collect the Act's exactions in the same manner as the penalties under § 6671 does not convey anything about the jurisdiction of a court to hear a suit challenging that assessment and collection. The Act does not provide that any textual reference to a penalty should be treated as a reference to a tax under the Internal Revenue Code, as § 6671 provides. Surely, Congress could have specified, as it did in § 6671, that it intended for the term "tax" in the tax code to refer to the penalties provided by the Act. It did not, and so I cannot conclude that § 1501(g)(1) and § 1513(d) of the Act by themselves convert the penalties into taxes for the purposes of the Anti-Injunction Act.[12]

The exactions provided by the Act for violation of the employer and individual coverage provisions do not otherwise fall within the term "tax" under the Anti-Injunction Act. The Anti-Injunction Act does not define "tax." In other contexts, the Supreme Court has recognized a difference between a tax and a penalty. *See Dep't of Revenue v. Kurth Ranch*, 511 U.S. 767,

---

[12] I need not determine whether the language of 26 U.S.C. § 6671 renders the penalties provided under that subchapter as "taxes" for the purpose of the Anti-Injunction Act. I observe that other courts have held that it does. *See Barr v. United States*, 736 F.2d 1134, 1135 (7th Cir. 1984); *Underwood v. United States*, No. CIV 06-0824, 2007 U.S. Dist. LEXIS 9679, at *4-5, 2007 WL 914710 (D.N.M. Jan. 12, 2007).

779-80 (1994) ("Whereas fines, penalties, and forfeitures are readily characterized as sanctions, taxes are typically different because they are usually motivated by revenue-raising, rather than punitive, purposes."); *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996) ("[A] tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government," whereas "if the concept of penalty means anything, it means punishment for an unlawful act or omission."); *United States v. La Franca*, 282 U.S. 568, 572 (1931) ("A tax is an enforced contribution to provide for the support of government; a penalty, as the word is here used, is an exaction imposed by statute as punishment for an unlawful act."). This distinction is not always easy to draw, as "[e]very tax is in some measure regulatory," *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937), and a regulatory penalty can raise revenue much like a tax would. The attempt to distinguish a tax from a penalty with regard to the applicability of the Anti-Injunction Act is further complicated by *Bob Jones University*, in which the Court stated that no distinction exists between "regulatory and revenue-raising taxes." 416 U.S. at 741 n.12. While *Bob Jones University* maintains that the purpose of a tax is irrelevant to whether a suit to enforce the tax is barred by the Anti-Injunction Act, it does not purport to stretch the meaning of the term "tax" in the Anti-Injunction Act to encompass exactions that are by their name and nature regulatory penalties, not taxes. To make sense of this indeterminacy, the United States Court of Appeals for the Fourth Circuit has asked whether the assessment was "(a) [a]n involuntary pecuniary burden, regardless of name, laid upon individuals or property; (b) [i]mposed by or under authority of the legislature; (c) [f]or public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; (d) [u]nder the police or taxing power of the state." *Leckie*, 99 F.3d at 583.

After considering the prevailing case law, I conclude that the better characterization of the exactions imposed under the Act for violations of the employer and individual coverage provisions is that of regulatory penalties, not taxes. In the Act, Congress called them a "penalty" and an "assessable penalty." Congress specifically chose not to label them as taxes when drafting the Act, although it described several other exactions in the Act as taxes. *See, e.g.,* Act § 1405 (imposing "on the sale of any taxable medical device by the manufacturer, producer, or importer a tax"); § 9001 (imposing a "tax" on high cost employer-sponsored health coverage); § 9015 (imposing a "tax" on additional hospital insurance for high-income taxpayers); § 10907 (imposing "on any indoor tanning service a tax"). To be sure, both mandatory coverage provisions are placed in the section of the tax code entitled "Miscellaneous Excise Taxes," but the tax code itself instructs that no inference of legislative construction is to be drawn from the location or grouping of any particular provision of the tax code. 26 U.S.C. § 7806(b).

Even more importantly, the assessments function as regulatory penalties—they encourage compliance with the Act by imposing a punitive expense on conduct that offends the Act. As I will discuss in Section IV, the statutory fees were enacted in aid of Congress' regulatory powers under the Commerce Clause. In its lengthy statutory findings on the individual coverage provision, § 1501(a), not once does Congress indicate that it was exercising its taxing authority to impose the penalties. Thus, the fourth criterion of the test applied in *Leckie* is deficient.[13] Although the penalties are expected to raise revenue (Defs.' Mem. Supp. Mot. Dismiss 37), they were not included among the "Revenue Provisions" of Title IX of the Act, which indicates that

---

[13] Congress enacted the provisions as an amendment to the Internal Revenue Code, which might weigh in favor of finding that the penalties are taxes under the *Leckie* test. *See Leckie,* 99 F.3d at 583 n.12. In this case, however, it is neither necessary nor advisable to determine whether the penalties would be constitutionally authorized under Congress' taxing power in order to apply the fourth prong of the *Leckie* test. It is enough that the penalties are a constitutional exercise of the power to regulate commerce, and that Congress did not purport to promulgate the legislation pursuant to its taxing power, to satisfactorily determine that the exactions are not "[u]nder the police or taxing power" of Congress for the purposes of *Leckie. See id.* at 583.

generating revenue was not their main purpose. Indeed, Defendants do not seek to deny the regulatory purpose of the penalties. (*See, e.g.*, Defs.' Mem. Supp. Mot. Dismiss 27-28, 37.) For these reasons, the Anti-Injunction Act does not divest this Court of jurisdiction to hear the present challenge.

## IV. CONGRESSIONAL AUTHORITY UNDER ARTICLE I

Plaintiffs allege in Count One of the complaint that the employer and individual coverage requirements are beyond the scope of Congress' authority provided by Article I of the Constitution. In response, Defendants identify three sources of constitutional authority for the provisions in question: the Commerce Clause, the General Welfare Clause, and the Necessary and Proper Clause. The burden is on Plaintiffs to make a "plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000). Because Plaintiffs bring a facial challenge, they must establish that "no set of circumstances exists under which the Act would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (quotations omitted).

For the reasons provided below, I hold that Congress acted in accordance with its constitutionally delegated powers under the Commerce Clause when it passed the employer and individual coverage provisions of the Act, and I will dismiss Count One. Because I find that the employer and individual coverage provisions are within Congress' authority under the Commerce Clause, it is unnecessary to consider whether the provisions would be constitutional exercises of power pursuant to the General Welfare Clause or the Necessary and Proper Clause.

## A. Individual Coverage Provision

The Constitution grants Congress the power to "regulate Commerce . . . among the several States . . . ." U.S. CONST. art. I, § 8, cl. 3. The Supreme Court has identified three general categories of regulation of interstate commerce in which Congress is authorized to engage. Congress can regulate the channels of interstate commerce, the instrumentalities of interstate commerce and persons or things in interstate commerce, and activities that substantially affect interstate commerce. *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005). The third category is the focus of this claim.

"In assessing the scope of Congress' authority under the Commerce Clause," the Court's task "is a modest one." *Id.* at 22. The Court need not itself determine whether the regulated activities, "taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id.* Congress must have a rational basis for determining that the "total incidence" of the class of activity substantially affects interstate commerce; "the *de minimis* character of individual instances arising under that statute is of no consequence." *Id.* at 17; *see also id.* at 22 ("That the regulation ensnares some purely intrastate activity is of no moment."). Where the regulated class of activities is within the reach of federal power, "the courts have no power to excise, as trivial, individual instances of the class." *Id.* at 23 (quotations omitted).

The Supreme Court has emphasized that it is economic activity that must substantially affect interstate commerce. *United States v. Lopez*, 514 U.S. 549, 559-61 (1995); *Morrison*, 529 U.S. at 614 ("[T]hus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature."). It has at the same time established that Congress' power to regulate activities that substantially affect

interstate commerce extends to regulation of "purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce." *Raich*, 545 U.S. at 17 (quotations omitted); *accord United States v. Malloy*, 568 F.3d 166, 179 (4th Cir. 2009). Local activity, regardless of whether it is commercial in nature, may still be reached by Congress if it "exerts a substantial economic effect on interstate commerce." *Raich*, 545 U.S. at 17. In addition, Congress can regulate "purely intrastate activity that is not itself 'commercial' . . . if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Id.* at 18.

It is well-established that Congress holds the authority to regulate the business of insurance. *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 552-53 (1944).

In question here is the Act's requirement that all individuals not exempted under the Act purchase and maintain minimum essential health care coverage. Plaintiffs make two interrelated arguments for finding that the individual coverage provision exceeds the authority granted to Congress under the Commerce Clause. According to Plaintiffs, the conduct regulated by the provision—the failure to purchase health insurance—is a decision not to engage in interstate commerce, and consequently it is not a form of activity; rather, it is better characterized as inactivity, or "simply existing." (Pls.' Opp'n 23.) Further, Plaintiffs charge that the failure to purchase health insurance is not commercial in nature, and does not "result in substantial direct economic effects" on interstate commerce. (Second Am. Compl. ¶ 100.) In contrast, Defendants argue that decisions to forego health insurance coverage *are* economic and substantially affect the interstate health care market because the uninsured, when sick, are able to obtain emergency room care for little or no money, shifting the costs for that uncompensated care on to health care providers, the insured population in the form of higher premiums, and the government. (Defs.'

Mem. Supp. Mot. Dismiss 30-31.)[14] Defendants contend that the costs of providing health care are multiplied by individuals who make the economic calculation not to purchase health insurance during the years when they are healthy but opt back into the health insurance system later when they need care. (*Id.* 32.) It is Defendants' stance that every individual must choose a way to finance the health care services that he or she will inevitably require, and that by making these choices one becomes an active market participant, not a passive bystander. (*Id.* 32-33.)

Plaintiffs contend that the individual coverage provision is similar to the statutes struck down in *Lopez* and *Morrison*, in that those statutes and the provision of the Act here all involved regulation of non-commercial activity or inactivity, and those cases should govern. Defendants respond that an individual's decision not to purchase health insurance is a form of economic activity, and the Court's decisions in *Wickard v. Filburn*, 317 U.S. 111 (1942) and *Raich* should dictate the result in the present matter. A review of those cases is helpful.

In *Lopez* and *Morrison*, the Supreme Court found that the challenged statutes legislated non-commercial activities, and it held that those activities were beyond the reach of federal power under the Commerce Clause. The Gun-Free School Zone Act of 1990, the statute at issue in *Lopez*, criminalized possession of a gun within a statutorily defined school zone. *Lopez*, 514 U.S. 549. The Court observed that the statute "by its terms has nothing to do with 'commerce' or any sort of economic enterprise," *id.* at 561, and concluded that possessing a gun in a school zone was not an economic activity, *id.* at 567. Finding that the link between the regulated activity and any effects on interstate commerce was too attenuated, the Court rejected the

---

[14] The Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, imposes on hospitals that participate in Medicare and offer emergency services the requirement to provide to persons presented for treatment "an appropriate medical screening . . . to determine whether or not an emergency medical condition . . . exists," and to stabilize the condition or, if medically warranted, to transfer such persons to other facilities. § 1395dd(a)-(c); *Williams v. United States*, 242 F.3d 169, 173-74 (4th Cir. 2001). Under § 1395dd, hospitals are required to perform these duties uniformly, "regardless of whether the persons arriving in the emergency rooms are insured or are able to pay." *Williams*, 242 F.3d at 174. Section 1395dd in effect guarantees a minimum level of health care without discrimination based on ability to pay.

government's arguments that possession of a gun in a school zone may result in violent crime and thereby affect the national economy through insurance costs, reduced travel, and diminished education and productivity. *Id.* at 567. The statute invalidated in *Lopez* regulated a single subject, the possession of firearms in a school zone, and was not "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* at 561. Similarly, in *Morrison*, the Court invalidated a federal civil remedy for the victims of gender-motivated crimes of violence based on its conclusion that the regulated conduct was noneconomic and of a criminal nature. *Morrison*, 529 U.S. at 613.

In *Wickard* and *Raich*, the Court upheld the laws being challenged as valid exercises of Congress' power under the Commerce Clause. *Wickard* concerned a penalty exacted under federal law on the wheat production of a commercial farm that exceeded marketing quotas established by statute. *Wickard*, 317 U.S. at 113. The penalty was part of a general statutory scheme to control the volume of wheat being sold in interstate commerce in order to avoid wheat surpluses and shortages, which caused wheat prices to fluctuate. *Id.* at 115. The Court upheld application of the penalty to wheat grown on the farm solely for personal consumption, reasoning that Congress could have rationally believed that a farmer's choice to grow his own wheat, when he otherwise would have had to purchase that wheat on the market, would substantially undermine the statute's purpose to control wheat prices. *Id.* at 128-29. The Court dismissed the plaintiff's arguments that the act forced farmers to purchase wheat in interstate commerce when they could otherwise grow it for themselves. *Id.* at 129.

*Raich*, the Court's most recent elaboration of Commerce Clause power pertinent to this case, also concerned the extent of federal power to regulate intrastate production for personal

consumption. In that case, the Court sustained Congress' authority to prohibit the local cultivation and possession of homegrown marijuana intended solely for personal use because the act as a whole regulated the "production, distribution, and consumption" of marijuana "for which there is an established, and lucrative, interstate market." *Raich*, 545 U.S. at 26. It was rational for Congress to believe that the failure to include locally cultivated marijuana for personal use in the law's regulatory scope would undermine the orderly enforcement of the entire regulatory scheme and significantly impact "the supply and demand sides of the market for marijuana." *Id.* at 28, 30. Together, *Wickard* and *Raich* teach that Congress has broad power to regulate purely local matters that have substantial economic effects, even where the regulated individuals claim not to participate in interstate commerce.

I will examine the congressional findings contained in the Act because they can be helpful in reviewing a statutory scheme, *see Raich*, 545 U.S. at 21, but I pause to observe that such findings are not sufficient, by themselves, to sustain the constitutionality of the Act, *see Morrison*, 529 U.S. at 614. In the congressional findings set forth in § 1501(a)(2), Congress explained that the national market in health insurance and health care services amounted to $2.5 trillion in 2009 and consumed 17.6 percent of the annual gross domestic product. It recognized that administrative costs for private health insurance were $90 billion in 2006 and constituted 26 to 30 percent of premiums in the individual and small group insurance markets. In addition, the costs of providing uncompensated care for the uninsured amounted to $43 billion in 2008 and were passed on to consumers in the form of substantially higher premiums. In order to reduce these significant costs and make coverage more affordable for consumers, Congress required non-exempted individuals to obtain health insurance coverage, which, together with the other provisions of the Act, Congress found would add millions of new consumers to the health

insurance market and increase the number of insured individuals. Without an individual coverage requirement, Congress found that healthy individuals would wait to purchase health insurance until they needed care, driving up the cost of health insurance premiums. Congress stated that the individual coverage requirement "is essential to creating effective health insurance markets" with broad health insurance pools including healthy individuals. Act § 1501(a)(2)(I).

While the unique nature of the market for health care and the breadth of the Act present a novel set of facts for consideration, the well-settled principles expounded in *Raich* and *Wickard* control the disposition of this claim. I hold that there is a rational basis for Congress to conclude that individuals' decisions about how and when to pay for health care are activities that in the aggregate substantially affect the interstate health care market.

The conduct regulated by the individual coverage provision—individuals' decisions to forego purchasing health insurance coverage—is economic in nature, and so the provision is not susceptible to the shortcomings of the statutes struck down by the Court in *Lopez* and *Morrison*. Nearly everyone will require health care services at some point in their lifetimes, and it is not always possible to predict when one will be afflicted by illness or injury and require care. The "fundamental need for health care and the necessity of paying for such services received" creates the market in health care services, of which nearly everyone is a participant. *Thomas More Law Ctr.*, 2010 U.S. Dist. LEXIS 107416, at *28. Regardless of whether one relies on an insurance policy, one's savings, or the backstop of free or reduced-cost emergency room services, one has made a choice regarding the method of payment for the health care services one expects to receive. Far from "inactivity," by choosing to forgo insurance, Plaintiffs are making an economic decision to try to pay for health care services later, out of pocket, rather than now, through the purchase of insurance. *Id.* at *26. As Congress found, the total incidence of these

economic decisions has a substantial impact on the national market for health care by collectively shifting billions of dollars on to other market participants and driving up the prices of insurance policies.

The conclusion that decisions to pay for health care without insurance are economic activities follows from the Supreme Court's rulings in *Wickard* and *Raich*. Plaintiffs' preference for paying for health care needs out of pocket rather than purchasing insurance on the market is much like the preference of the plaintiff farmer in *Wickard* for fulfilling his demand for wheat by growing his own rather than by purchasing it. Plaintiffs do not consider themselves to be engaging in commerce, but as in *Wickard*, economic activity subject to regulation under the Commerce Clause need not involve transacting business in the marketplace. *See Wickard*, 317 U.S. at 128 ("[T]he power to regulate commerce includes the power to regulate . . . *the practices affecting*" the prices of commodities in interstate commerce.) (emphasis added). In *Wickard*, the plaintiff argued that his production of wheat was "not intended in any part for commerce but wholly for consumption on the farm." *Id.* at 118. The Court rejected that argument, stating that one effect of Congress' regulation was to "forestall resort to the market by producing to meet [one's] own needs." *Id.* at 127. Because of the nature of supply and demand, Plaintiffs' choices directly affect the price of insurance in the market, which Congress set out in the Act to control.

*Raich* is equally applicable. The plaintiffs there, neither of whom bought or sold marijuana, claimed that they were not participating in commerce at all. But the Court held that it was rational to conclude that growing marijuana at home, whatever the nature of that activity, exerted in the aggregate a substantial economic effect on interstate commerce because it affected the supply and demand in the national market for marijuana. *Raich*, 545 U.S. at 19. Here, similarly, the choice of individuals to go uninsured affects national market conditions for health

insurance, reducing the supply of consumers of health insurance who are in good health, and thereby increasing the cost of covering the insured population. Plaintiffs cannot avoid extension of the Act to their conduct just because they allege they provide for their own care and will not, in fact, obtain uncompensated care at the expense of other market participants. As long as the regulated class of activities is within the reach of federal power, "the courts have no power to excise, as trivial, individual instances of the class." *Id.* at 23 (quotations omitted).

The conduct regulated by the individual coverage provision is also within the scope of Congress' powers under the Commerce Clause because it is rational to believe the failure to regulate the uninsured would undercut the Act's larger regulatory scheme for the interstate health care market. *See id.* at 18; *cf. Wickard*, 317 U.S. at 128-29 ("Congress may properly have considered that wheat consumed on the farm where grown, if wholly outside the scheme of regulation, would have a substantial effect in defeating and obstructing its purpose to stimulate trade therein at increased prices."). The Act institutes a number of reforms of the interstate insurance market to increase the availability and affordability of health insurance, including the requirement that insurers guarantee coverage for all individuals, even those with preexisting medical conditions. As Congress stated in its findings, the individual coverage provision is "essential" to this larger regulatory scheme because without it, individuals would postpone health insurance until they need substantial care, at which point the Act would obligate insurers to cover them at the same cost as everyone else. This would increase the cost of health insurance and decrease the number of insured individuals—precisely the harms that Congress sought to address with the Act's regulatory measures.

For these reasons, the individual coverage requirement is a valid exercise of federal power under the Commerce Clause, even as applied to the facts of this case.

## B. Employer Coverage Provision

Plaintiffs also maintain that the requirement that applicable large employers supply minimum essential coverage for their employees is an unconstitutional exercise of power under the Commerce Clause. In the complaint, Plaintiffs allege that employers are being compelled by the Act to participate in interstate commerce when they otherwise would not, just as individuals are forced into the marketplace by the individual coverage provision. (Second Am. Compl. ¶¶ 96-99.) According to Plaintiffs, the Commerce Clause does not grant Congress the authority to require employers to provide "certain additional benefits" to all of their employees, *i.e.*, to "purchase a particular product at a particular price." (Pls.' Opp'n 26.) Defendants respond that the employer coverage provision facially regulates interstate economic matters. Regulating the terms by which an employer sponsors health insurance for its employees is the same as regulating the terms of employment, which is within the Commerce Clause power. (Defs.' Mem. Supp. Mot. Dismiss 38).

As Defendants correctly point out, it is well-established in Supreme Court precedent that Congress has the power to regulate the terms and conditions of employment. *See United States v. Darby*, 312 U.S. 100 (1941) (upholding the Fair Labor Standards Act ("FLSA"), which requires certain employers to pay their employees a minimum wage and to pay overtime wages for work in excess of a statutorily-specified amount of hours); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33-43 (1937) (upholding the National Labor Relations Act ("NLRA") of 1935, which prohibits unfair labor practices and restricts employer interference with union membership); *NLRB v. Fainblatt*, 306 U.S. 601, 604-09 (1939) (upholding Congress' authority to enforce the NLRA against a small garment business); *Baltimore & Ohio R.R. Co. v. Interstate Commerce Comm'n*, 221 U.S. 612, 619 (1911) (upholding statute prescribing maximum hours

for employees engaged in intrastate activity connected with the movement of any train); *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 537 (1985) (upholding Congress' authority to enforce the FLSA's minimum wage and overtime standards against both private and public employers); *see also EEOC v. Wyoming*, 460 U.S. 226, 248 (1983) (Stevens, J., concurring) ("Today, there should be universal agreement on the proposition that Congress has ample power to regulate the terms and conditions of employment throughout the economy.").

The opportunity provided to an employee to enroll in an employer-sponsored health care plan is a valuable benefit offered in exchange for the employee's labor, much like a wage or salary. The Act requires that certain large employers offer employees the opportunity to enroll in "minimum essential coverage under an eligible employer-sponsored plan." Act § 1513(a)(1). The requirement imposed by the Act on employers to offer a minimum level of health insurance resembles the requirement imposed by the FLSA on employers to offer a minimum wage upheld in *Darby*, and Plaintiffs fail to distinguish the two. Plaintiffs' depiction of the employer coverage provision as requiring employers to purchase a product against their will is misleading; the employer coverage requirement is more accurately described as regulating the terms of the employment contract. Employers regulated under § 1513 are already engaged in commerce—that employers need to arrange with third party insurers to offer such coverage to their employees is of no consequence.

A rational basis exists for Congress to conclude that the terms of health coverage offered by employers to their employees have substantial effects cumulatively on interstate commerce. Maintaining adequate health care coverage is among the foremost concerns of employees when considering whether to take advantage of better job opportunities. "Job lock" occurs when a worker declines to accept a better job because taking the new job requires giving up the worker's

current health plan, and he fears he will be unable to obtain a comparable one. *See* CONG. BUDGET OFFICE, KEY ISSUES IN ANALYZING MAJOR HEALTH INSURANCE PROPOSALS 8, 164-65 (2008). In this way, the interstate economy is impeded by the failure of certain large employers to offer adequate health care coverage. Accordingly, the employer coverage provision is a lawful exercise of Congress' Commerce Clause power.

## V. TENTH AMENDMENT

Plaintiffs charge in Count Two of the complaint that the Act is unconstitutional for violating the Tenth Amendment. The Tenth Amendment states, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. The amendment is violated if (1) Congress does not have authority under the Constitution to pass the regulation, or (2) the means of regulation employed impermissibly infringe on state sovereignty by undercutting and displacing state authority and by commandeering state legislative functions. *United States v. Johnson*, 114 F.3d 476, 480-81 (4th Cir. 1997); *New York v. United States*, 505 U.S. 144, 159 (1992).

The first basis for invalidity fails because the Act is a valid exercise of Congress' Commerce Clause power. *See New York*, 505 U.S. at 156 ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States.").

The second basis also lacks merit. Plaintiffs allege that the requirement that individuals obtain health insurance and that states create health benefit exchanges undercuts and displaces state authority, although they do not explain in any detail what state authority is being intruded upon. (Pls.' Opp'n 32.) Plaintiffs rest their argument on *Johnson*, 114 F.3d 476. There, the

Fourth Circuit addressed the claim that the Child Support Recovery Act, which criminalized the willful non-payment of state-ordered child support, impermissibly undercut and displaced state authority over the areas of criminal law and family law. *Id.* at 480-81. The court rejected the challenge, holding that federal laws criminalizing conduct are "commonplace under the dual-sovereign concept" and involve no violation where they are constitutionally authorized. *Id.* at 481. *Johnson* does not help Plaintiffs; Congress has the constitutional power to regulate the business of insurance, *South-Eastern Underwriters Ass'n*, 322 U.S. at 552-53, and has frequently regulated health insurance and health care services.[15] Apart from exceeding Congress' enumerated powers under Article I, which the Act does not, there is no foundation under *Johnson* for invalidating the regulatory scheme.

Plaintiffs also say that the Act commandeers state legislative functions because it directs states to create health benefit exchanges. (Pls.' Opp'n 32-33.) But states are merely given the option to set up the exchanges. The Act authorizes each state to adopt the federal standards for health benefit exchanges or pass state laws that satisfactorily implement the standards. Act § 1321(b). If a state chooses not to do so, then the federal government must establish and operate the exchange within the state. Act § 1321(c). Congress has the power to offer states the choice of regulating private activity according to federal standards or having state law preempted by federal regulation. *New York*, 505 U.S. at 167. In this respect, the Act is plainly constitutional. Count Two will be dismissed.

---

[15] *See, e.g.*, Medicare Act, Pub. L. No. 89-97, 79 Stat. 286, 42 U.S.C. § 1395 *et seq.* (providing government-funded health insurance for the aged); Employee Retirement and Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829, 29 U.S.C. § 1001 *et seq.* (establishing federal requirements for health insurance plans offered by private employers); Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, 100 Stat. 82, § 1161 *et seq.* (enabling workers who lose their health benefits to continue receiving certain benefits from their plans for a time); Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936, 42 U.S.C. § 1320d *et seq.* (directly regulating private health insurance plans).

# VI. ESTABLISHMENT CLAUSE

Plaintiffs raise Establishment Clause challenges to the religious conscience exemption and to the health care sharing ministry exemption to the individual coverage provision. *See* Act § 1501(d)(2). Plaintiffs allege that, because the Act invests in Defendants the right to determine which sects are "recognized" pursuant to the religious conscience exemption, it presents a host of Establishment Clause difficulties, including: lacking a secular purpose, privileging certain religious sects over others, fostering excessive entanglement by requiring the government to make doctrinal decisions, and demonstrating hostility toward Plaintiffs' religious beliefs. (Second Am. Compl. ¶¶ 120-128.) Plaintiffs further allege that the healthcare sharing ministries exemption violates the Establishment Clause because it arbitrarily excludes Plaintiffs from availing themselves of its benefits. (*Id.* ¶ 129.)

The First Amendment to the Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. CONST. amend. I. While these two clauses, known as the Establishment Clause and Free Exercise Clause, "express complementary values, they often exert conflicting pressures." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005) (citing *Locke v. Davey*, 540 U.S. 712, 718 (2004); *Walz v. Tax Comm'n*, 397 U.S. 664, 668-69 (1970)). Despite this tension, "'there is room for play in the joints' between the Clauses." *Cutter*, 544 U.S at 719 (quoting *Walz*, 397 U.S. at 669). That is, there is an interstice in which Congress can take action "neither compelled by the Free Exercise Clause nor prohibited by the Establishment Clause." *Id.* at 719. The accommodation of religious exercise fits within this category.

In *Cutter*, the Supreme Court upheld a provision of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") against an Establishment Clause challenge.

*Id.* at 713. Among other things, RLUIPA requires courts to apply a strict scrutiny standard of review where the government imposes a "substantial burden on the religious exercise" of institutionalized persons. 42 US.C. § 2000cc-1(a)(1)-(2). Respondent, the director of the Ohio Department of Rehabilitation and Correction, brought a facial challenge to RLUIPA. Speaking for the unanimous Court, Justice Ginsburg wrote "[t]his Court has long recognized that the government may . . . accommodate religious practices . . . without violating the Establishment Clause.'" *Cutter*, 544 U.S. at 713 (quoting *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144-45 (1987)); *see also Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987) (upholding exemption of Title VII's prohibition on religious discrimination as applied to secular nonprofit activities of a church).

While the Court noted that certain accommodations might "devolve into 'an unlawful fostering of religion,'" RLUIPA did not cross the line. *Cutter*, 544 U.S. at 714 (quoting *Corp. of the Presiding Bishop*, 483 U.S. at 334-35). First, the statute "alleviated exceptional government-created burdens on private religious exercise." *Id.* at 720 (citing *Bd. of Ed. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 705 (1994)). That is, RLUIPA created accommodations for "institutionalized persons who are unable freely to attend to their religious needs . . . ." *Id.* at 721. In the same vein, the Court noted with approval Congress' accommodation of religious practice in the military. *Id.* at 722. Second, RLUIPA's accommodation was "measured so that it does not override other significant interests." *Id.* The act was unlike that struck down in *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709 (1985), which "arm[ed] Sabbath observers with an absolute and unqualified right not to work on whatever day they designate[d] as their Sabbath." Third, the Court found it significant that "RLUIPA does not differentiate among bona fide faiths." *Cutter*, 544 U.S. at 723. The Court distinguished *Kiryas Joel*, which invalidated a

state law creating a special school district for the Satmar sect of Hasidic Jews. *Kiryas Joel*, 512 U.S. at 690.

Significantly, in *Cutter*, the Court declined to follow *Lemon v. Kurtzman*, 403 U.S. 602 (1971), which has long provided the standard means of analyzing Establishment Clause cases. *See Cutter*, 544 U.S. at 717 n.6. *Lemon's* three-part test requires that "[f]irst the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; [and] finally, the statute must not foster an excessive government entanglement with religion." 403 U.S. at 612-13. In *Agostini v. Felton*, 521 U.S. 203, 218, 223-33 (1997), the Court "folded the entanglement inquiry into the primary effect inquiry . . . because both inquiries rely on the same evidence, and the degree of entanglement has implications for whether a statute advances or inhibits religion." *Zelman v. Simmons-Harris*, 536 U.S. 639, 668 (2002) (O'Connor, J., concurring) (citation omitted); *see also Madison v. Reiter*, 355 F.3d 310, 319-20 (4th Cir. 2003). Although critics have been sounding the death knell of *Lemon* for some time,[16] it remains good law and merits this Court's attention. *See McCreary County, Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 859 (2005) (interpreting the "secular purpose" requirement).

## A. Religious Conscience Exemption

Considering first the religious conscience exemption, I observe at the outset that the exemption adopts the § 1402(g)(1) exemption from the Internal Revenue Code, and every court to consider an Establishment Clause challenge to § 1402(g)(1) over the last forty years has upheld the exemption. *See Varga v. United States*, 467 F. Supp. 1113, 1118-19 (D. Md. 1979);

---

[16] *See Cutter*, 544 U.S. at 726 n.1 (Thomas, J., concurring) (calling the *Lemon* test "discredited"); *Van Orden v. Perry*, 545 U.S. 677, 685-86 (2005) (declining to apply the *Lemon* test); *Wallace v. Jaffree*, 472 U.S. 38, 110 (1985) (Rehnquist, J., dissenting) ("The three-part [*Lemon*] test has simply not provided adequate standards for deciding Establishment Clause cases, as this Court has slowly come to realize.").

*Droz v. Comm'r*, 48 F.3d 1120, 1124 (9th Cir. 1995); *Hatcher v. Comm'r*, 688 F.2d 82, 83-84 (10th Cir. 1979); *Jaggard v. Comm'r*, 582 F.2d 1189, 1190 (8th Cir. 1978); *Henson v. Comm'r*, 66 T.C. 835, 838 (1976); *Palmer v. Comm'r*, 52 T.C. 310, 314-15 (1969). While the mere fact of a long history cannot cure an otherwise unconstitutional practice, it is "not something to be lightly cast aside." *Walz*, 397 U.S. at 678.

Moreover, the provision falls well within the bounds for permissible religious accommodation under *Cutter*. First, the exception relieves a government-imposed burden on religious exercise. It ameliorates the burden that the Act would otherwise impose on those who have a conscientious objection to the receipt of medical benefits. Second, the exception does not override other significant interests. Unlike the accommodation struck down in *Caldor*, the religious conscience exemption does not arm its beneficiaries with the right to trample over the interests of others.

Finally, the exemption does not "differentiate among bona fide faiths" in any relevant sense. The accommodation ensures that similarly situated groups are treated similarly. *See Kiryas Joel*, 512 U.S. at 703; *see also id.* at 727 (Kennedy, J., concurring) ("Nor is it true that New York's failure to accommodate another religious community facing similar burdens would be insulated from challenge in the courts."). Accommodations may "justify treating those who share [a particular] belief differently from those who do not; but they do not justify discriminations based on sect." *Id.* at 715 (O'Connor, J., concurring). By its terms, the religious conscience exemption applies to all members of all recognized faiths that have a sincere, conscientious objection to receiving medical benefits. Plaintiffs in this case have no such objection, and therefore cannot claim that they are burdened in the same way that the religious conscience exemption contemplates. Nor is there any reason to believe that the exemption will

be applied in a way that would result in disparate treatment of similarly situated persons. The accommodation is therefore not problematic under *Cutter*.

Plaintiffs urge that the religious conscience exemption creates excessive entanglement under *Lemon*, because it "vests Defendants with the right to determine what is a recognized religious sect entitled to exemption under the Act" and calls for surveillance and "monitoring of the tenets of certain religious sects and sincerity of adherents' beliefs." (Pls.' Opp'n 41-42.) First, it bears repeating that the Supreme Court and Fourth Circuit have recognized that the entanglement inquiry is largely subsumed into the primary effects prong of *Lemon*. *See Zelman*, 536 U.S. at 668; *Madison*, 355 F.3d at 319-20. The parties do not seem to dispute that the primary effect of the legislation in this case is neither to advance nor inhibit religion. Evaluating a religious exemption to Title VII in *Corporation of the Presiding Bishop*, the Court recognized that "[f]or a law to have forbidden 'effects' under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence." 483 U.S. at 337. The Court has also distinguished between the impermissible grant of affirmative benefits on the basis of religion, and "allow[ing] religious communities and institutions to pursue their own interests free from governmental interference." *Kiryas Joel*, 512 U.S. at 706 (citing *Corp. of the Presiding Bishop*, 483 U.S. at 336-37).

Furthermore, there is no indication—other than Plaintiffs' naked assertion—that the exemption in issue would require "monitoring" of religious practices. In *Lemon*, the challenged statute used state funds to pay teachers of non-sectarian subjects in religious schools. The state would have to "be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion . . . [and therefore a] comprehensive, discriminating, and continuing state surveillance will inevitably be required . . . ." *Lemon*, 403 U.S. at 619. In contrast, the religious conscience

exemption would merely require a one-time or periodic inquiry into the existence of a religious sect, the existence of that sect's tenets pertaining to abstention from acceptance of medical benefits, and an individual's bona fide belief in those tenets. A one-time or periodic review does not by itself create impermissible entanglement. *See Bowen v. Kendrick*, 487 U.S. 589, 615 (1988) (upholding law allowing government to "police the grants that are given out . . . to ensure that federal funds are not used for impermissible purposes."); *Roemer v. Bd. of Pub. Works*, 426 U.S. 736, 764-65 (1976) (upholding law contemplating the occasional audit of universities to assure non-sectarian use of funds). After all, "[e]ntanglement must be 'excessive' before it runs afoul of the Establishment Clause." *Agostini*, 521 U.S. at 233.

Nor is it constitutionally problematic to inquire into whether a belief is "religious" in nature and sincerely held. *See Benning v. Georgia,* 391 F.3d 1299, 1313 (11th Cir. 2004); *Sutton v. Rasheed*, 323 F.3d 236, 250-51 (3d Cir. 2003). I note in this regard that RLUIPA's requirement that a plaintiff show a substantial burden on the free exercise of religion requires a threshold showing that a religious belief or practice exists. To hold that courts or the government cannot inquire into the existence of such beliefs or practices would severely hamper the government's ability to thwart frivolous or fraudulent claims.

Finally, Plaintiffs' assertion that the exemption lacks a secular purpose is without merit. The secular purpose requirement "does not mean that the law's purpose must be unrelated to religion . . . . Rather, *Lemon's* 'purpose' requirement aims at preventing the relevant governmental decisionmaker from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." *Corp. of the Presiding Bishop*, 483 U.S. at 335. Accordingly, "[u]nder the *Lemon* analysis, it is a permissible legislative purpose to alleviate

significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Id.*

As the religious conscience exemption falls within permissible boundaries set in *Cutter* and *Lemon*, the Court finds that it is unproblematic under the Establishment Clause.

## B. Health Care Sharing Ministries Exemption

Plaintiffs' allegations concerning the health care sharing ministries exemption are far leaner than their allegations regarding the religious conscience exemption. In sum, Liberty alleges that the health care sharing ministries exemption "discriminates against Liberty University's religious beliefs by implementing an arbitrary date of December 31, 1999 for participation in a healthcare sharing plan." (Second Am. Compl. ¶ 129.) As an initial matter, it is worth noting that I.R.C. § 1402(g)(1), which has been upheld numerous times, *see* part A, *supra*, is similarly limited in applicability to members of sects which have "been in existence at all times" since 1950. Moreover, the Court must read the time limitation in light of *Cutter's* requirement that an accommodation be "measured so that it does not override other significant interests." 544 U.S. at 722. If Congress allowed any and all groups to form healthcare sharing 501(c)(3) organizations, it could effect an end-run around the mandatory coverage provisions.

For reasons substantially similar to those discussed above, the health care sharing ministries exemption is a constitutionally permissible accommodation of religion under *Cutter* and *Lemon.* Therefore, Plaintiffs' Establishment Clause claims are without merit and will be dismissed.

## VII. FREE EXERCISE CLAUSE AND RELIGIOUS FREEDOM RESTORATION ACT

Counts Four and Five of Plaintiffs' complaint raise challenges under the Free Exercise Clause and Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1. The essence of those claims is that the Act forces Plaintiffs to violate their "sincerely held religious beliefs against facilitating, subsidizing, easing, funding, or supporting abortions." (Second Am. Compl. ¶ 142.)[17] Liberty also alleges that the Act will prohibit it from "providing health care choices for employees that do not conflict with the mission of the University and the core Christian values under which it and its employees order their day to day lives." (Pls.' Opp'n 36.)

### A. Free Exercise Clause

The Free Exercise Clause does not excuse individuals from compliance with neutral laws of general applicability. *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 878-79 (1990). However, "[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). To survive a free exercise challenge, such a law must "advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Id.* (quotations omitted). Plaintiffs contend that the Act is not a neutral law of general applicability, and that this Court should apply the "most rigorous scrutiny" in evaluating any free exercise implications. In support of this contention, Plaintiffs submit that the religious exemptions identified above render the Act non-neutral on its face. I disagree.

---

[17] Plaintiffs' brief characterizes the complaint as raising other Free Exercise claims: "Plaintiffs [also] state that they conduct their daily lives in accordance with their sincerely held religious beliefs, which includes making healthy lifestyle choices, paying only for health care procedures that are necessary . . . and paying for their health care services as they need them." (Pls.' Opp'n 35-36.) A fair reading of the complaint does not support this novel characterization, and the parties have not briefed these issues.

At the outset it bears repeating that Congress is free to accommodate religious practices without running afoul of either of the religion clauses. Accommodation occupies the "play in the joints" between the Establishment Clause and the Free Exercise Clause. *Cutter*, 544 U.S. at 719. Moreover, *Lukumi* shows that the neutrality inquiry in the free exercise context seeks to protect "against governmental *hostility* [toward religion] which is masked, as well as overt." *Lukumi*, 508 U.S. at 534 (emphasis added). The Act demonstrates no such hostility. Contrary to Plaintiffs' contention, the Act does not effect a "religious gerrymander" of the sort that animated the *Lukumi* decision. In *Lukumi*, the Court overturned a facially neutral city ordinance where there was overwhelming evidence that the law was imposed to prevent practitioners of the Santeria religion from performing ritual animal sacrifice. *Id.* at 526. The law was appropriately described as a "gerrymander" because "[t]he net result . . . is that few if any killings of animals [were] prohibited other than Santeria sacrifice . . . ." *Id.* at 536. The Act is a far cry from the ordinance at issue in *Lukumi*, the only purpose of which was to single out a religious sect for negative treatment.

Moreover, the Court in *Locke* significantly softened the facial neutrality rule of *Lukumi*. In *Locke*, the Court upheld the constitutionality of a state statute that established a scholarship program for post-secondary students, but explicitly prohibited use of scholarship funds to support studies in devotional theology. 540 U.S. at 715. While the respondent charged that the statute was presumptively unconstitutional because of its apparent lack of facial neutrality, the Court rejected the claim:

> [T]o do otherwise would extend the *Lukumi* line of cases well beyond not only their facts but their reasoning. . . . In the present case, the State's disfavor of religion (if it can be called that) is of a far milder kind. It imposes neither criminal nor civil sanctions on any type of religious service or rite. It does not deny to ministers the right to participate in the political affairs of the community.

> And it does not require students to choose between their religious
> beliefs and receiving a government benefit.

*Id.* at 720-21 (citations omitted). Similarly, the Act presents none of the above identified infirmities. It cannot fairly be said to display a "disfavor" of religion. Instead it shows a respect for religious exercise by carving out exceptions for those who are conscientiously opposed to receiving health care benefits, and those who share medical benefits in accordance with their religious beliefs. The mere fact that Plaintiffs may not avail themselves of either of the religious exemptions does not show disfavor or hostility.

In addition, Plaintiffs have not raised a plausible claim that the Act burdens religious practice. They fail to allege how any payments required under the Act, whether fines, fees, taxes, or the cost of the policy, would be used to fund abortion. Indeed, the Act contains strict safeguards at multiple levels to prevent federal funds from being used to pay for abortion services beyond those in cases of rape or incest, or where the life of the woman would be endangered. *See* Act §§ 1303, 1334; *Exec. Order No. 13,535 of Mar. 24, 2010*, 75 Fed. Reg. 15,599. In plans that do provide non-excepted abortion coverage, a separate payment for non-excepted abortion services must be made by the policyholder to the insurer, and the insurer must deposit those payments in a separate allocation account that consists solely of those payments; the insurer must use only the amounts in that account to pay for non-excepted abortion services. Act § 1303(b)(2)(B), (C). Insurers are prohibited from using funds attributable to premium tax credits or cost-sharing reductions in out-of-pocket maximum limits for individuals with income below 400 percent of the federal poverty level to pay for non-excepted abortion services. Act § 1303(b)(2)(A).

Furthermore, at least one plan that does not cover non-excepted abortion services will be offered for enrollment through each of the state health benefit exchanges, as required by the Act.

Act § 1334(a)(6). Moreover, the Act specifically allows plans in the exchanges to decline to cover *all* abortion services whatsoever, including excepted abortion services. Act § 1303(b)(1). Liberty already makes available private insurance policies, and provides "health care services that are desirable to its employees and consistent with the University's core Christian values . . . ." (Second Am. Compl. ¶¶ 29, 31.) Plaintiffs have raised no plausible allegation that they will be unable to participate in providing or purchasing similar health care services when the Act is fully implemented. As such, their free exercise claim is not plausible under *Iqbal*, 129 S. Ct. at 1949-51.

## B. Religious Freedom Restoration Act

RFRA, which was enacted as a direct response to the Court's decision in *Smith*, generally forbids the government from imposing a substantial burden on the free exercise of religion, "even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). A substantial burden is only permissible if the government "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id*. § 2000bb-1(b). As discussed in part A, *supra*, Plaintiffs' conclusory allegations that they will be burdened are not entitled to a presumption of truth under *Iqbal*, 129 S. Ct. at 1950-51. Because Plaintiffs' RFRA claim, like their free exercise claim, fails to allege more than a "mere possibility" of harm, it is insufficient to withstand a motion to dismiss. *Id.* at 1949.

## VIII. EQUAL PROTECTION

In Count Six, Plaintiffs allege that the individual coverage provision infringes on their right to equal protection under the due process clause of the Fifth Amendment. Specifically,

Plaintiffs argue that the religious conscience exemption and the health care sharing ministries exemption treat Plaintiffs, who have religious objections to the Act but do not qualify for either of the exemptions, differently than other similarly situated individuals and organizations that have religious objections and do satisfy the requirements of one of the exemptions. (Second Am. Compl. ¶¶ 157-59; Pls.' Opp'n 44.)

Under equal protection law, "all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982). "Unless a statute provokes strict judicial scrutiny because it interferes with a fundamental right or discriminates against a suspect class, it will ordinarily survive an equal protection attack so long as the challenged classification is rationally related to a legitimate governmental purpose." *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457-58 (1988) (quotations omitted). "Heightened scrutiny is applied to an equal protection challenge to a regulation which applies selectively to religious activity only if the plaintiff can show the basis for the distinction was religious and not secular in nature." *Olsen v. Comm'r*, 709 F.2d 278, 283 (4th Cir. 1983) (citing *Gillette v. United States*, 401 U.S. 437, 452 (1971)). "If the justification for the distinction is secular, it need only be rational." *Id.*

A rational basis exists where the distinction "advances legitimate legislative goals in a rational fashion." *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981). The distinction need not be perfect, and may in practice result in some inequity. *Id.* The court does not ask whether the distinction will advance the legislative goals in fact, only whether the legislature rationally could have believed that the distinction would promote those goals. *W. & S. Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 671-72 (1981). That a statute is underinclusive because it contains an exemption does not make it irrational. "[T]he reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The

legislature may select one phase of one field and apply a remedy there, neglecting the others." *Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 489 (1955) (citation omitted).

I must first determine which level of scrutiny to apply to these classifications. Although Plaintiffs state in a footnote in their brief that they do not concede that rational basis review applies, they do not provide any argument for reviewing the classification under heightened scrutiny. (Pls.' Opp'n 45 n.1.) Notably, neither exemption is addressed on its face to a particular religious sect or division thereof; instead, both exemptions identify characteristics that cut across denominations. The exemptions serve the valid secular purpose of accommodating the religious practice of persons who have religious objections to accepting the benefits of health insurance or who already share health expenses with others in accordance with shared religious beliefs. Alleviation of significant governmental interference with religious practice is a legitimate, secular legislative purpose. *See Corp. of the Presiding Bishop*, 483 U.S. at 335; *Gillette*, 401 U.S. at 453-54; *Ward v. Comm'r*, 608 F.2d 599, 602 (5th Cir. 1979); *Jaggard*, 582 F.2d at 1190. Accordingly, with no reason to believe the exemptions were designed to favor or penalize a particular religious group, I proceed to analyze the exemptions under rational basis review.

Both exemptions easily satisfy the rationality standard. The religious conscience exemption accommodates those religious adherents who meet the criteria of § 1402(g)(1); courts have repeatedly held, when confronted with an equal protection challenge, that § 1402(g)(1) is rationally related to legitimate government objectives. *See Droz*, 48 F.3d at 1125; *Bethel Baptist Church v. United States*, 822 F.2d 1334, 1341-42 (3d Cir. 1987); *Templeton v. Comm'r*, 719 F.2d 1408, 1413-14 (7th Cir. 1983); *Ward*, 608 F.2d at 602. Here, Congress could have rationally believed that the religious conscience exemption to the requirement to purchase individual health care coverage would alleviate interference with religious adherents' ability to exercise their faith.

Congress found that the individual coverage provision is "essential" to the operation of the Act, § 1501(a)(2)(H)-(I), and consequently had good reason to limit the scope of exemptions granted from the requirement to those individuals who are members of religious groups that make provision for their dependent members and whose religious convictions are irreconcilable with the requirements of the Act, *see Templeton*, 719 F.2d at 1413-14. The limitation to religious sects in existence since December 31, 1950 may prevent others from taking advantage of the exemption, but it is not irrational. *See Bethel Baptist Church*, 822 F.2d at 1342.

For substantially the same reasons, the distinction made in the health care sharing ministries exemption is rationally related to the legitimate goal of accommodating the exercise of religion while limiting the scope of the exemption. It is reasonable to believe that, of individuals without health care coverage, members of religious organizations that share medical expenses among their members are less likely to incur uncompensated care—which would shift their health care costs on to third parties—than other individuals. Congress could have believed that the limitation to such ministries in existence since December 31, 1999 operates to exempt only ministries with established records of providing for their members. The distinction need not be perfect, *Schweiker*, 450 U.S. at 234, only rational, and I conclude that it is. Plaintiffs' equal protection challenge will be dismissed.

## IX. FREEDOM OF SPEECH AND ASSOCIATION

In Count Seven, Plaintiffs charge that the Act violates their rights of freedom of speech and association guaranteed under the First Amendment. Plaintiffs primarily frame the constitutional violation as one of compelled association. The challenge amounts to an allegation that the employer and individual coverage provisions, by requiring Plaintiffs to purchase health insurance for themselves or their employees, force Plaintiffs to associate with those who

"support or engage in abortion" and with insurers who fund abortions. (Second Am. Compl. ¶ 169; Pls.' Opp'n 41.) Plaintiffs allege that this involuntary association interferes with their ability to exercise their religious beliefs, which include "not being yoked with those who support or engage in abortions." (Pls.' Opp'n 41.)

The Constitution protects one's right to associate with others for the purpose of engaging in activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). First Amendment rights cannot be adequately protected unless one has the right to join together with others to exercise those rights. *Id.* at 622. The Supreme Court has recognized that forcing a group engaged in expressive activity to accept members it does not desire may impair the freedom of association. *Id.* at 623 ("Freedom of association [] plainly presupposes a freedom not to associate.").[18]

Plaintiffs' challenge—essentially a restated free exercise claim—is misplaced. Plaintiffs allege that they hold the religious belief that they should not associate with those who support or engage in abortion. In that case, the problem is the possibility of Defendants' infringement on Plaintiffs' free exercise of their religious belief not to "yoke" themselves with others.[19] No impairment of their ability to associate with others to engage in activities protected by the First Amendment appears to be alleged. As Defendants correctly point out, the requirement to purchase health insurance does not prevent Plaintiffs from expressing their views about anything and does not require them to endorse a view with which they disagree. (Defs.' Mem. Supp. Mot.

---

[18] Government actions also may infringe on the freedom to associate by imposing penalties or withholding benefits from individuals because of their membership in a disfavored group, *Healy v. James*, 408 U.S. 169, 180-84 (1972), requiring disclosure of the fact of membership in a group seeking anonymity, *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 91-92 (1982), or by interfering with the internal affairs of a group, *Cousins v. Wigoda*, 419 U.S. 477, 487-88 (1975).

[19] *United States v. Lee*, 455 U.S. 252 (1982), the only case Plaintiffs cite in support of this argument, addressed a challenge under the right to freely exercise one's religion, not to freely associate with others.

Dismiss 45.) To the extent that Plaintiffs must associate with others, the association is minimally disruptive, as it was in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 69-70 (2006) (hereinafter "*FAIR*"). In that case, the Supreme Court held that a law requiring law schools to accept military recruiters on campus did not affect the schools' associational rights because the schools were merely required to "interact with" recruiters, not accept recruiters as part of the school. *Id.* at 69-70 ("A military recruiter's mere presence on campus does not violate a law school's right to associate, regardless of how repugnant the law school considers the recruiter's message."). The Act does not require health plans to cover abortion, and it ensures that at least one policy offered through each health benefit exchange will not cover non-excepted abortion services. Act §§ 1303, 1334; *see also* discussion in Section VII.A, *supra*. Consequently, the purported association here is merely that Plaintiffs will be forced to hold insurance policies in the same health care system in which other policies cover abortion. The connection is too remote to intrude upon Plaintiffs' free association rights.

Plaintiffs' free speech claim fares no better. It is not elaborated in much detail in either the complaint or Plaintiffs' brief, however, I will read the pleadings as raising two grounds for violation of Plaintiffs' free speech rights. First, according to Plaintiffs, decisions about paying for health care are a form of speech, and by requiring Plaintiffs to purchase health insurance, the Act allegedly forces Plaintiffs' speech. (*See* Pls.' Opp'n 41.) Freedom of speech prohibits the government from telling people what they must say. *FAIR*, 547 U.S. at 63. The government's ability to force a speaker to host or accommodate another speaker's message where it affects the complaining speaker's message is also limited. *Id.*[20] Plaintiffs argue that *Wooley v. Maynard*,

---

[20] *See also Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 566 (1995) (state law cannot require a parade to include a group whose message the parade's organizer does not wish to send); *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 20-21 (1986) (plurality opinion) (state agency cannot require a utility company to include a third-party newsletter in its billing envelope); *accord id.*, at 25 (Marshall, J.,

430 U.S. 705 (1977) supports their claim. There, the Court held that the state of New Hampshire could not force the appellees to display a license plate bearing the motto "Live Free or Die," to which the appellees had moral, religious, and political objections. *Wooley*, 430 U.S. at 713. But Plaintiffs cite no case for the proposition that compelling the purchase of insurance expresses a message, let alone would express a particular message about Plaintiffs' position on abortion with which Plaintiffs disagree. Obtaining a health care policy is a commercial transaction that reflects a personal choice about the best mix of coverage and price that serves one's medical needs. While one's religious beliefs may factor into the choice about which health care policy to purchase, the purchase and maintenance of the policy is not itself a speech activity, thus the First Amendment is not implicated.

Plaintiffs' second argument for infringement is that the mandatory payment for health insurance, or any payment of "fines, fees and taxes" imposed by the Act, are being used to subsidize speech with which Plaintiffs disagree; specifically, the funds are being used to cover abortion services. (Second Am. Compl. ¶ 169.) Free speech protection is implicated where the government requires an individual to subsidize a private message with which he disagrees. *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005). Such forced subsidies of speech were held to be unconstitutional where nonunion public school teachers were required to pay a fee to unions that was used to fund political speech, *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209 (1977), and where lawyers admitted to practice in California were forced to pay a state bar association which it used for political expression, *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990). But free speech rights are not violated where the individual is required to subsidize a government message with which he disagrees. *See Johanns*, 544 U.S. at 559. Compelled support of

---

concurring); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (right-of-reply statute violates editors' right to determine the content of their newspapers).

government programs, even those that advocate a position on a particular issue, is "perfectly constitutional, as every taxpayer must attest." *Id.*; *accord Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000) ("The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties.").

Here, Plaintiffs fail to allege how any payments required under the Act, whether fines, fees, taxes, or the cost of the policy, would be used to fund abortion. *See Twombly*, 550 U.S. at 570 (requiring "enough facts to state a claim to relief that is plausible on its face."). As I explained in detail in the discussion of Plaintiffs' free exercise claim, *see* Section VII.A, *supra*, the Act contains safeguards to prevent federal funds from being used to pay for abortion services beyond those in cases of rape or incest, or where the life of the woman would be endangered, and requires the segregation of payments for non-excepted abortion services. Act §§ 1303, 1334; *Exec. Order No. 13,535 of Mar. 24, 2010*, 75 Fed. Reg. 15,599. Even if those provisions were not considered sufficient to protect against Plaintiffs' payments being used to support non-excepted abortion coverage, the government may support by taxes or other exactions a health care delivery program, even one that could be considered to express a perspective on abortion, without violating Plaintiffs' free speech rights. *See Bd. of Regents of Univ. of Wis. Sys.*, 529 U.S. at 229.[21] Count Seven will be dismissed.

## X. CAPITATION TAX AND DIRECT TAX

The Constitution directs that "[n]o Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or enumeration herein before directed to be taken," U.S. CONST. art. I,

---

[21] In regard to forced subsidization of private speech, Plaintiffs have not alleged in sufficient detail for this Court's evaluation any mechanism whereby Plaintiffs' funds would be used to cover abortion services. On this facial challenge, where Plaintiffs must allege the Act is unconstitutional in all of its applications, the Court does not need to speculate about the possibility that the segregation of funds into allocated accounts would fail to prevent Plaintiffs' funds from contributing to abortion services.

§ 9, cl. 4, and provides that "direct Taxes shall be apportioned among the several States . . . according to their respective Numbers," U.S. CONST. art I, § 2, cl. 3. Plaintiffs allege in Count Eight that the penalty provisions set forth in the Act for the employer and individual coverage requirements are unconstitutional capitation or direct taxes. Whether the Act was authorized under the commerce power or the power to tax is relevant to this consideration. *Edye v. Robertson (Head Money Cases)*, 112 U.S. 580, 595-96 (1884). The imposition of assessments is a legitimate means of regulating commerce, and "[i]f regulation is the primary purpose of a statute, revenue raised under the statute will be considered a fee rather than a tax." *South Carolina ex rel. Tindal v. Block*, 717 F.2d 874, 887 (4th Cir. 1983) (exaction on commercially-sold milk not a tax); *see also Rodgers v. United States*, 138 F.2d 992, 994 (6th Cir. 1943) (cotton marketing quotas not a tax); *United States v. Stangland*, 242 F.2d 843, 848 (7th Cir. 1957) (wheat marketing quotas not a tax).

As I held above, the employer and individual coverage provisions are a regulation of interstate commerce authorized by the Commerce Clause. Although the penalties collected under the Act are expected to raise revenue, their main purpose is to enforce the requirement that individuals and employers purchase or provide health insurance. Therefore, the penalty provisions, as "mere incident[s] of the regulation of commerce," *Head Money Cases*, 112 U.S. at 595, are not considered taxes for the purpose of the present claim. *See Thomas More Law Ctr.*, 2010 U.S. Dist. LEXIS 107416, at *29-31 (rejecting a challenge to the constitutionality of the penalty provisions of the individual coverage requirement of the Act). Count Eight will be dismissed.

## XI. GUARANTEE CLAUSE

The Guarantee Clause provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government . . . ." U.S. CONST. art. IV, § 4. The meaning of the Guarantee Clause has not been clearly delineated, but it is rarely a basis for finding an act of Congress unconstitutional. *See Largess v. Sup. Jud. Ct. for the State of Mass.*, 373 F.3d 219, 226-27 (1st Cir. 2004) ("If there is any role for federal courts under the Clause, it is restricted to real threats to a republican form of government."). The United States Court of Appeals for the First Circuit defined a republican form of government as having the characteristics of a supreme power resting in a body of citizens entitled to vote and exercised by elected officers and representatives responsible to them and governing according to law. *Id.* at 227.

Plaintiffs' claim in Count Nine is that the Act grants to Congress the ability to "veto" the private choices about health care made by individuals, employers, and states, giving the federal government "absolute sovereignty" and "censorial power" over the people. (Pls.' Opp'n 34-35.)[22] The Act does no such thing; nothing prevents the people and their representatives from amending or repealing the Act through the democratic process. Because I hold above that the challenged provisions of the Act are well within Congress' authority under the Commerce Clause, I find the Guarantee Clause claim to lack merit.

## XII. CONCLUSION

For the reasons stated herein, the Court will grant Defendants' Motion to Dismiss. An appropriate order will follow.

---

[22] Plaintiffs also allege that the Act forces state governments to adopt federal standards "or lose their sovereignty." (Pls.' Opp'n 35.) As I explained in Section V, *supra*, Congress has the power to give states the choice whether to adopt regulations or have the federal government adopt and implement those regulations. *See New York*, 505 U.S. at 167.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this 30th day of November, 2010.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE